## JUELICH v. UNITED STATES.
### No. 14900.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1954.

Frank M. Gleason, Rossville, Ga., for appellant.

James W. Dorsey, U. S. Atty., and H. H. Tysinger, Asst. U. S. Atty., Atlanta, Ga., J. Robert Sparks, Asst. U. S. Atty., Greenville, Ga., John W. Stokes, Jr., Asst. U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and RICE, District Judge.

RICE, District Judge.

This is an appeal by Herbert Eugene Juelich from a death sentence imposed upon him by the District Court of the United States for the Northern District of Georgia.

Juelich and Larson were, on August 25, 1953, jointly indicted in the Rome Division of said court, and therein charged with shooting and murdering, on August 8, 1953, in said division of said court, Samuel E. Vaughn, who was then known to the defendants to be a Deputy United States Marshal, on account of and while in the performance of his official duties. The defendants were tried to the same jury, and the latter, in finding defendant Larson guilty, recommended mercy; whereupon he was sentenced to life imprisonment and does not appeal. The jury, in finding Juelich guilty of murder in the first degree, did not recommend mercy and he was given a death sentence.

Prior to September 8, 1953, the court appointed two members of the Georgia Bar to represent defendant Juelich (who will be hereafter referred to as defendant) and on said last mentioned date defendant was arraigned and plead not guilty to the charge set forth in the indictment.

Thereafter defendant presented to the court a number of motions, several of which are hereinafter set forth, each of which was by the court denied:

(1) For change of venue because prejudicial publicity throughout the Northern District of Georgia rendered it impossible for him to secure a fair trial in the Rome Division of said Northern District of Georgia.

(2) In the alternative should the court overrule the motion for change of venue, a motion that the cause be continued for a sufficient period of time to permit public opinion to subside.

(3) In the alternative, that the judge try the case without a jury.

(4) A challenge to the array of the entire panel of jurors (with the exception of two) after they were questioned on voir dire, for the reason that each member of the panel had shown himself disqualified.

(5) To continue the case so as to have a jury drawn not prejudiced by the highly prejudicial news items and radio broadcasts. This motion was made after examination of the jurors on voir dire.

(6) A challenge to the poll of each individual juror.

Defendant's motion for change of venue came on for hearing in November, 1953, before the court then sitting in Atlanta, Georgia. The defendant was not present, and his counsel objected to proceeding with the hearing in the absence of defendant, taking the position that under the provisions of Rule 43 of the Federal Rules of Criminal Procedure the presence of their client was required by law. The trial court required the hearing to proceed for the remainder of that day, but the defendant was produced and was present the next day and during the remainder of the hearing. Defendant takes the position that the trial court committed reversible error in not permitting him to be present throughout the hearing on his motion for change of venue.

Defendant's court appointed counsel ably represented their client at every step of the way, with highly commendable zeal and earnestness, and here urge many assignments, contending in reference to each that reversible error is shown. Several of these assignments present interesting questions of law which will not be discussed or further alluded to in this opinion because we have reached the conclusion that this case must be reversed because defendant was forced to trial before a jury, every member of which admitted he had an opinion that the defendant was guilty, and the trial court committed reversible error in holding the members of the jury were qualified.

It is uncontradicted that on August 8, 1953, Juelich, and Larson were being transported by automobile from Nashville, Tennessee, to the Federal Penitentiary at Atlanta, Georgia, to serve terms of five years imprisonment after having been convicted in a Federal Court at Nashville, Tennessee, for the commission of an offense against the laws of the United States.

These prisoners were in the custody of Deputy United States Marshal Vaughn,

who had with him a guard, a man by the name of Hightower. The two officers were seated in the front seat of the car, the two prisoners, handcuffed and shackled, were on the back seat. After they had entered the State of Georgia, and while Vaughn was driving at high speed, according to Hightower, Juelich, who in some manner had removed his handcuffs, reached over the front and grabbed Vaughn's gun. Larson joined in the scuffle and the car proceeded down the highway driverless at a high rate of speed. Juelich got Vaughn's gun; Hightower grabbed the steering wheel and brought the car to a stop; Vaughn reached for the door handle; then three shots sounded and Vaughn fell out of the car. The two convicts disarmed Hightower and made him a prisoner. The three concealed themselves in the woods until they were found about four days later by members of the Georgia National Guard. These happenings occurred not far from Rome, Georgia, the place where Juelich and Larson were later put on trial.

A farmer living near the scene of the shooting saw the officer's car proceeding down the highway at a fast rate of speed, apparently out of control; it was then brought under control and stopped. He approached within a short distance when three shots rang out and a body rolled out upon the highway. The car then proceeded down the highway and he went to the man lying in the highway. Others stopped, an ambulance was summoned, but Vaughn lived only a short time.

The alarm was immediately sounded; road blocks were set; blood hounds put upon the trail; a unit of the Georgia National Guard was put in the field; members of the Federal Bureau of Investigation, of the State Police, many peace officers and armed citizens took up the man hunt, aided by airplanes. The armed officers went from house to house and the countryside was finely combed for four days before the defendants were captured.

The newspapers throughout the area carried lurid banner headlines and stories of the event. The same was true as to the broadcasts over the radio and television. The prisoners were referred to as outlaws, desperados, killers, and murderers; it was stated that Juelich had a long record; that Juelich had confessed to the Federal Bureau of Investigation; and the countryside was warned that they were armed and were dangerous. By the press, the radio, and by television the public was kept constantly informed as to the progress of the "man hunt" in language calculated to inflame.

Proof of the foregoing was made in the motion for change of venue, and was further developed in the interrogation of the members of the jury panel. The court overruled the motion for change of venue when the jury was selected.

From the record it appears that eighty-one jurors composed the panel in this case. Of these, ten were excused; fifty-one testified they were of the opinion that both defendants were engaged in killing the officer; twelve were of the opinion that either or both were guilty; two were of the opinion that Juelich was the guilty party; while six had no opinion.

Each of the twelve jurors empaneled to try the defendant testified on voir dire examination that from reading the newspapers, listening to newscasts over the radio and television, or discussions, he had formed an opinion that the defendant was guilty. A short résumé of the testimony of each of the jurors is set out below:

1. Walter T. Slaughter testified that he had an opinion, but it was not a crystalized opinion which would be conclusive, that one or both of the defendants killed the Deputy Marshal. He had no fixed opinion as to whether they murdered him, but did have a definite opinion as to the killing; that proof of their innocence would cause him to acquit them. He understood the burden would lie on the government to prove defendants guilty and that the defendants did not have the burden of proving their innocence.

2. R. Haynes Wicker testified that he had formed the opinion that one or both

of the prisoners killed the officer and that nothing had happened since that time to change his opinion. If selected as a juror he would enter upon his service with the opinion that one or the other of the defendants actually killed the officer. He understood the meaning of the word "murder" and would enter the jury box with the opinion that one or the other of the defendants was guilty of the offense of murder; that notwithstanding his present belief that one or both of the defendants were guilty of murder, proof of their innocence made in court would cause him to acquit them. He understood that the burden would be on the government to prove by evidence on the trial whether the defendants were guilty or not, and that the defendants did not have the burden of proving their innocence. He thought he could go into the jury box with a fair mind, listen to the evidence and base his verdict upon the evidence. He believed he could exclude any opinion that he had arrived at in reaching a verdict.

3. Clarence H. Murphy assumed from what he had heard and read that one or both of the defendants killed the officer. He understood the meaning of the word "murder" and as far as he knew he would call the killing of the officer murder. If accepted as a juror he would enter upon his service with the opinion that one or both of the defendants were guilty of the offense of murdering Mr. Vaughn unless evidence came up otherwise; that if proof of the defendants' innocence was introduced it would cause him to acquit one or both of them. He understood the burden was on the government to prove the defendants guilty, and that in reaching a verdict and weighing the evidence he should take the evidence and testimony from the witness stand and use that as a basis for his verdict. He thought he could exclude the opinions or ideas he had derived from news broadcasts.

4. John B. Lovell testified that he had reached a tentative opinion that one of the prisoners killed the officer and that nothing had come to his knowledge since forming that opinion to change it; that he understood the meaning of the word "murder" but had no opinion as to whether or not the prisoners murdered the officer. If selected as a juror he would probably have the same opinion; that if the proof showed the defendants were innocent then he would not hesitate to acquit them; that his opinion would yield readily to the sworn testimony.

5. H. Lee Hicks testified he had formed the opinion that one or both of the prisoners killed the officer and had come to the conclusion that one or both of the defendants murdered the officer; that he still had that opinion and would enter the jury box still of that opinion. That notwithstanding his opinion if he heard proof from the witness stand of the defendants' innocence he would acquit them. If taken as a juror the opinion which he then had would give way to the testimony that he heard from the witness stand and he thought he could base his verdict on the evidence free from that opinion.

6. Louie Verner Andrews testified he had an opinion that both of the defendants had a part in the killing. He understood the meaning of the word "murder" and had come to the conclusion that both of the defendants were guilty of the murder of the officer; that nothing had happened since forming that opinion to change his mind; that if selected as a juror he would enter the jury box with that opinion, but that proof of the defendants' innocence would cause him to acquit them. That any opinion that he then had would give way to the sworn testimony and that would be the basis of his verdict if he were selected.

7. Frank R. Swinney testified that he believed both defendants were connected with the killing of the officer. He understood the meaning of the word "murder" and had come to the conclusion that one or both of the defendants were guilty of the murder of the officer; that nothing had come to his mind since forming this opinion to cause him to change it. At the time he was testifying he was still of the same opinion, and if taken as a juror he would go into the jury box with

that opinion. That notwithstanding his opinion of the guilt of the defendants if proof of their innocence were offered it would cause him to acquit them. He understood the burden was on the government to prove the defendants guilty and the government would have to carry that burden before he would find the defendants guilty; that any opinion which he had would give way to the sworn testimony if he were a juror.

8. Jennings B. Gordon testified he had formed the opinion that the defendants were guilty of killing the officer; that if taken as a juror he would not enter the jury box under the opinion that both of the defendants were guilty of the offense, but that one of them was. That his opinion would give way or yield to the sworn testimony in the case. That proof of the innocence of the defendants would cause him to acquit them. He understood that the government had the burden of proving beyond a reasonable doubt that the defendants were guilty, and that the defendants did not have the burden of proving their innocence.

9. Amon W. Chandler testified that he understood the meaning of "murder" in its legal sense and had come to the conclusion that one or both of the defendants were guilty of the offense of murdering the officer. That since forming that opinion he had heard nothing to cause him to change it, and that he had this opinion at the time his testimony was being taken. If selected as a juror he would enter the jury box with that opinion, but if evidence of the innocence of the defendants were brought into court he would acquit the defendants. He understood the government had the burden of proof beyond a reasonable doubt and that the defendants did not have to carry the burden of proof as to their innocence. That any opinion he then had would yield or give way to the sworn testimony or evidence from the stand on the trial of the case.

10. Robert Cordle Bagley testified that he had an opinion that one or both of the defendants killed the officer. He thought he knew the meaning of the word "murder" in its legal sense and that he had come to the opinion that one or both of the defendants were guilty of murdering the officer. That since forming this opinion nothing had come to his attention which would cause him to change that opinion; that if selected as a juror he would go into the box with the opinion that one or both of the defendants were guilty of the offense unless something else came up; that notwithstanding his opinion, if proof of the innocence of the defendants was offered in court it would cause him to acquit them. He understood the United States had the burden of proof beyond a reasonable doubt before the defendants could be found guilty, and that the defendants did not have the burden of proving themselves innocent. That any opinion which he had would yield or give way to sworn testimony on the trial of the case.

11. Clyde R. Conner testified, in answer to the question as to whether or not he had formed an opinion "I would not know whether I would use the word 'opinion' but I have come to the conclusion, I would say." He testified he would assume the two defendants, either jointly or severally, were responsible for the death of the Marshal. He understood the meaning of the word "murder" in its legal sense and he had come to the conclusion that one or both of the defendants were guilty of taking the officer's life. Since forming his opinion nothing had happened or occurred to change his mind, and if accepted as a juror he would enter upon his service with that conclusion in his mind; that notwithstanding his opinion, if proof of the innocence of the defendants or either of them were offered in evidence it would cause him to acquit them. He understood the government had the burden to prove the defendants guilty beyond a reasonable doubt before he could convict, and he also understood that the defendants did not have any burden to carry as to their defense. That notwithstanding his opinion in reference to defendants, it would give way to the sworn testimony and evidence that was adduced from the stand in the trial of the case.

12. Marshall Allgood testified he had formed an opinion that one of the prisoners killed the officer; that he understood what was meant by the word "murder"; that he had come to the conclusion that one or both of the defendants were guilty of the murder of the officer; that since forming his opinion nothing had happened to change his opinion, and if taken as a juror he would enter upon his service with this opinion in his mind. That notwithstanding his opinion, if defendants made proof of their innocence he would acquit them. He understood that the entire burden rested upon the government to prove the defendants guilty beyond a reasonable doubt and that no burden rested on the defendants to prove their innocence. If taken as a juror he would base his verdict solely on the evidence that came from the witness stand and any opinion he might have formed would give way to that evidence.

We understand the rule to be as laid down in the case of Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244:

"The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence.

The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest."

In the foregoing case two members of the jury panel had formed an opinion from hearsay which they said would not influence their verdict. They were held qualified by the trial court and were challenged by the defendant.

In the case of Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021, Judge Holmes applied the foregoing rule in a case wherein the trial court held to be qualified a juror whose opinion was based on newspaper reports, and the defendant felt aggrieved because he was forced to waste a challenge.

In Maddox v. Georgia, 32 Ga. 581, 585, the trial court held a juror to be qualified who stated he had a fixed opinion from hearsay as to defendant's guilt. The defendant challenged the juror peremptorily and on conviction assigned the action of the court as error. In this case, after the juror had stated he had a fixed opinion, the court asked him "Would or would not your opinion yield to testimony? Do you or not think you could do justice to the prisoner?" To which he replied "I think I could but I would rather get off." The ruling of the trial court that the juror was qualified was held error.

We have not yet found any decision, and we have been cited to none, wherein a defendant has been held to have had a fair trial after conviction by a jury of twelve men, every member of which had sworn on voir dire that he had an opinion the defendant was guilty.

When the life of a man hangs in the balance we should insist that the fullest protection of his right to a trial before a fair and impartial jury should be accorded him. Society is here attempting to take away the life of one of its members. That attempt must be tested by the highest standards of justice and fairness that we know.

Justice Jackson, in a concurring opinion in Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 550, 95 L.Ed. 740, wrote:

"* * * But if freedoms of press are so abused as to make fair trial in the locality impossible, the judicial process must be protected by removing the trial to a forum beyond its probable influence. Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial. These convictions, accompanied by such events, do not meet any civilized conception of due process of law. That alone is sufficient, to my mind, to warrant reversal."

We are of the opinion that on the clear showing here made the trial court should either have sustained defendant's motion to change the venue of the case, or should have granted a continuance for such period of time as might be necessary to insure that a fair and impartial jury could be obtained. We are further of the opinion that the trial court committed reversible error in forcing defendant to trial before a jury, every man thereon having entered the jury box with the opinion that the defendant was guilty.

This cause is, therefore, reversed and remanded.