**UNITED STATES of America**
**v.**
**Ross R. BARNETT and Paul B.**
**Johnson, Jr.**
**No. 20240.**

United States Court of Appeals
Fifth Circuit.
May 5, 1965.

Tuttle, Chief Judge, and John R. Brown and Wisdom, Circuit Judges, dissented.

Leon Jaworski, W. H. Vaughan, Jr., Houston, Tex., for appellant.

Constance Baker Motley, New York City, for James H. Meredith.

Dugas Shands, Asst. Atty. Gen. of Miss., Charles Clark, Malcolm B. Montgomery, Jackson, Miss., Fred B. Smith, Ripley, Miss., M. M. Roberts, Hattiesburg, Miss., Garner W. Green, Sr., Jackson, Miss., for appellee.

## ORDER

Before TUTTLE, Chief Judge, and RIVES, JONES, BROWN, WISDOM, GEWIN, and BELL, Circuit Judges.

RIVES, JONES, GEWIN and BELL, Circuit Judges:

## CIVIL CONTEMPT

This Court, in September 1962, entered its findings of fact, conclusions of law, and judgments of civil contempt adjudg-

ing Ross R. Barnett and Paul B. Johnson, Jr., in civil contempt of the temporary restraining orders of this Court entered September 25, 1962. There has since been substantial compliance with this Court's orders. It therefore appears that no further proceedings in civil contempt are needed, and that it is appropriate to enter an order formally terminating the civil contempt proceedings.

## CRIMINAL CONTEMPT

■■ Criminal contempt is a *sui generis* proceeding for the protection of the integrity of the Court. The criminal contempt proceedings against Ross R. Barnett and Paul B. Johnson, Jr., were instituted pursuant to the order and direction of this Court of November 15, 1962. (J. Gewin dissenting). Those proceedings are, therefore, within the control of the Court and the Court has the power and authority to order them dismissed.[1]

■ At the present time no sufficient reasons exist for the further prosecution of the proceedings against Barnett and Johnson. In the light of substantial compliance with the Court's orders, considerations of respect for the Court do not require the further prosecution of the criminal contempt proceedings. Nor does such further prosecution appear necessary for the purpose of deterring others from committing offenses like or similar to the alleged acts of contempt. The Civil Rights Act of 1964 has been generally recognized as creating a status under which the "law of the land" is now beyond question. Indeed there has been widespread, voluntary compliance with the provisions of said Act. It is highly improbable that other persons will hereafter commit acts similar to those herein charged.

The lapse of time since this Court ordered the criminal contempt proceedings to be instituted, and the changed circumstances and conditions have rendered the

---

1. See In re Fletcher, 4 Cir., 1954, 216 F.2d 915; MacNeil v. United States, 1 Cir., 1956, 236 F.2d 149, 61 A.L.R.2d 1075; 17 C.J.S. Contempt § 63, p. 162; 17 Am.Jur.2d Contempt, § 81, p. 74.

further prosecution of criminal contempt proceedings unnecessary. The rationale at least in part of Hamm v. City of Rockhill, 1964, 379 U.S. 306, 315, 317, 85 S.Ct. 384, 391, 13 L.Ed.2d 300, where the Civil Rights Act of 1964 was applied retroactively to abate state sit-in prosecutions, was based on the purpose of the Act "to obliterate the effect of a distressing chapter of our history." It was held that no public interest was to be served in continuing the prosecution. And so it is here. In what we consider an appropriate application of restraint to judicial power, we close out another part of the same chapter.

It is fortunate that we can so conclude because there may be no fair alternative course. Jury trial as a matter of right has been ruled out by the Supreme Court. For reasons which need not be stated, jury trial as a matter of discretion would not be granted by majority vote of this Court. For the same acts for which they stand charged with criminal contempt, the defendants have already been tried and adjudged by this Court to be in civil contempt.[2] This Court has already found against them on all of the elements of criminal contempt, excepting only that of intent, willfulness. That state of mind must be determined by inference from evidence, most if not all of which has been introduced and considered by the Court in the civil contempt proceedings. While we know that every judge of this Court would do his conscientious best to try the criminal contempt proceedings fairly and impartially, we are doubtful, to say the least, whether we and the other judges may not have formed a fixed opinion that the defendants are guilty.[3]

Thus some, or all of the present membership of this Court may be disqualified from sitting on a trial on the merits of these criminal contempt charges.[4] The statute[5] makes no provision for any replacement judge to sit on this en banc court and we doubt whether one can properly be devised by judicial invention. It follows that a fair trial on the merits is the subject of doubt, and dismissal of the criminal proceeding is the only course open that is clearly consistent with fundamental fairness.

The civil contempt judgments will stand but no sanctions will be imposed. The criminal proceeding is dismissed for the reasons stated above.

It is so ordered.

TUTTLE, Chief Judge, and JOHN R. BROWN and WISDOM, Circuit Judges (dissenting).

TUTTLE, Chief Judge (dissenting):

With deference, I dissent. This Court, on January 4, 1963· commenced criminal contempt proceedings against Ross Barnett and Paul Johnson, Jr., upon the following assertions, among others:

> "Probable cause has been made to appear from the application of the Attorney General filed December 21, 1962, in the name of and on behalf of the United States that on September 25, 1962, Ross R. Barnett, having been served with and having actual notice of this Court's temporary restraining order of September 25, 1962, wilfully prevented James H. Meredith from entering the offices of the Board of Trustees of the University of Mississippi in Jackson,

2. This statement contemplates granting the motion of the government to dismiss Counts 3 and 4. These counts relate to the failure of defendants to maintain law and order at the university. The remaining two counts involve the frustration of the registration of Meredith by the defendants.

3. See discussion of the disqualification of the judges in opinion of Judge Jones in United States v. Barnett et al., 5 Cir., 1963, 330 F.2d 369, at pages 419–421;

compare also Juelich v. United States, 5 Cir., 1954, 214 F.2d 950, 955.

4. Compare the provision of Rule 42(b), F.R.Crim.P. that, "if the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent."

5. Section 46(c) of Title 28, U.S.Code, providing in part, "A court in banc shall consist of all circuit judges in regular active service."

Mississippi, and thereby deliberately prevented James H. Meredith from enrolling as a student in the University pursuant to this Court's order of July 28, 1962; that on September 26, 1962, Paul B. Johnson, Jr., acting under the authorization and direction of Ross R. Barnett, and as his agent and as an agent and officer of the State of Mississippi, and while having actual notice of the temporary restraining order of September 25, 1962, wilfully prevented James H. Meredith from entering the campus of the University of Mississippi in Oxford, Mississippi, and thereby deliberately prevented James H. Meredith from enrolling as a student in the University, pursuant to the orders of this Court. * * * "

As the Court believed then I believe now: the charges were sufficiently grave to require a trial. The gravity of the charges was enhanced, not lessened, by the fact that they were against a governor and lieutenant governor of a state.

I agree that the Court now has full power to continue the prosecution or to dismiss it without more. I fully respect the judgment of those who believe the public interest, including the integrity of the judicial system, calls now for a dismissal. I do not share that judgment. As I believed then, I believe now, that the public interest requires that a trial be held and that the guilt or innocence of these two respondents be determined.

JOHN R. BROWN, Circuit Judge (dissenting):

This Court, almost if not quite unanimously, has recently declared[1] that the Executive has the uncontrolled discretion to determine whether a prosecution once commenced must go forward. That principle, by way of analogy, is pertinent here. Criminal contempt, as the cases

often and just recently point out, partakes much of a criminal proceeding. A major distinction, however, is the identity of the *initiating* agency—for traditional criminal proceedings, the Executive; for criminal contempt, the Court. Despite some fundamental differences, I think the parallel is close, and I therefore agree with the Court that a Court initiating a charge of criminal contempt must have the power to determine whether the proceeding once commenced must inevitably go forward to trial and resulting conviction or acquittal. The Judiciary clothed in this particular instance with awesome powers comparable to those of the Executive in criminal proceedings has the right, and probably the unreviewable duty, to determine whether the public interest will best be served by a discontinuance short of trial. My difference, therefore, is in the assessment of the public interest and how it will be furthered or hindered by this action.[2]

In concluding that the public interest requires that we continue on with the trial of the remaining charges we set in motion, I would emphasize, as does Judge Wisdom in Part V of his dissent, that I neither intimate guilt nor prejudge the outcome. Our dissents merely reiterate as echoes what our earlier order declared —there is probable cause and reasonable need for instituting and trying the charges. To conclude that we should adhere is no more a prejudgment than the entry of the order initiating the charges. Surely, the act of the Court in assaying the case and the public interest in its further continuance cannot transmute the dissenters' voice of difference into a prejudgment on the merits.

The Court, without demonstrating any factual support for its conclusion that all should halt now, dismisses the proceedings. Within the Court's announced opinion, I find no support for this gen-

1. United States v. Cox [Jan. 26, 1965], Hauberg v. Cox [Jan. 26, 1965], 5 Cir., 1965, 342 F.2d 167.

2. Although I think the proceeding against Ross Barnett should go forward, I would find it easy to join in a severance (and postponement) of the case against former Lieutenant Governor, now Governor, Paul B. Johnson, Jr.

eralized conclusion, nor can I find any when I examine all possible reasons.

We are dealing here with conduct of the State's highest officer. That conduct —whatever might be its legal sufficiency to supply the essential ingredient of *willfulness*—was and was intended by Governor Barnett to be a physical obstruction to this Court's decree that Meredith be admitted to the University. The conflict, on Governor Barnett's own words,[3] was the State of Mississippi versus The United States of America. Consequently, as articulated by Judge Wisdom in Part IV of his dissent, this is more than contempt of this Court. The "contempt charge" is "the contempt of a governor of a state against the Nation."

Governor Barnett, for reasons officially proclaimed, undertook physically to prevent Meredith's admission, the very thing specifically ordered by this Court. He was, in short, marshaling the whole force of Mississippi in opposing, not upholding, compliance with the Court's orders. This parallels closely action of another and earlier governor whose conduct was the subject of Sterling v. Constantin, 1932, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375. Of his effort to justify the use of state military force to prevent compliance with a positive order of a Federal Court, the United States Supreme Court had this to say:

"Instead of affording them protection in the lawful exercise of their rights as determined by the courts [the Governor] sought, by his executive orders, to make that exercise impossible. In the place of judicial procedure, available in the courts which were open and functioning, he set up his executive commands which brooked neither delay nor appeal. In particular, to the process of the Federal court actually and properly en-

gaged in examining and protecting an asserted federal right, the Governor interposed the obstruction of his will, subverting the federal authority. The assertion that such action can be taken as conclusive proof of its own necessity and must be accepted as in itself due process of law has no support in the decisions of this Court." 287 U.S. at 402, 53 S. Ct. at 197.

Almost as if writing in 1932 of Governor Barnett's actions in 1962, that unanimous Court through Chief Justice Hughes clearly outlines where duty lies:

"If it be assumed that the Governor was entitled to declare a state of insurrection and to bring military force to the aid of civil authority, the proper use of that power in this instance was to maintain the federal court in the exercise of its jurisdiction, and not to attempt to override it; to aid in making its process effective and not to nullify it, to remove, and not to create, obstructions to the exercise by the complainants of their rights as judicially declared." 287 U.S. at 404, 53 S.Ct. at 197.

Precisely because his duty was so high, the likely consequences of his interposition so devastating, the responsibilities of moral leadership in the maintenance of law and order in the face of unpopular situations so awesome, it is important that Governor Barnett be held accountable for his actions which he would be the first to minimize in importance. To be held accountable is not to forecast the outcome. To be held accountable is not to speak in terms of punishment or even the certainty of it. To be held accountable is merely to require that through an orderly, fair trial,[4] it be determined whether the conduct of

---

3. See note 2 and accompanying text Part VI of Judge Wisdom's dissent.

4. Although discussed candidly by Government counsel on its own motion in the briefs precipitated by the pretrial hearing held in the fall of 1964, none of the briefs (numbering in the hundreds of

pages) filed by the highly skilled, energetic and responsible counsel for Governor Barnett even remotely hint at the disqualification of any one or more or all of the members of this Court to sit on this case because the order charged to be violated was ours, or that we initiated

this high officer was or was not legally justifiable, was or was not a willful disobedience to a lawful order of this Court.

Now no one will ever know. The public—whose interest is at stake as we try to make constitutional federalism work—will know only that a governor successfully interposed himself to prevent compliance. It will know only that, save for skirmishes on procedural problems over the course of three years, such Governor never had to answer to the charges [5] which this Court thought serious enough to warrant their being brought and substantial enough to occupy its attention and that of the Nation's highest tribunal on several occasions, one of which concerned an issue of constitutional proportions closer in its 5-to-4 outcome than the 4-to-3 vote here. The chapter,[6] with its death and violence, is indeed a regrettable one. But it is so not because a Court order was issued. Rather, it is because the Court order was not affirmatively, actively enforced by those now charged with obstruction of it. In the supremacy of the Constitution, in the supremacy of the rule of law, much suffers when a governor can do the things here charged without ever facing up to either the consequences [7] or even a judicial determination of legality or illegality.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent. To my mind, the Court's decision represents the exercise of judicial license, not of judicial restraint.

I do not complain of Ross Barnett's escaping punishment. I complain of a governor's escaping the risk of punishment an ordinary citizen or, perhaps, a registrar of voters runs if he is indicted for criminal contempt.

Sunday, September 30, 1962, was a climactic day for James Meredith. On three occasions before that day, the Governor and Lieutenant-Governor of Mississippi, with state highway troopers, sheriffs, and local police officers, had formed a wall barring Meredith's way into the University of Mississippi. No one will ever know whether the Governor of Mississippi could have made that Sunday a day to be remembered as marking the Deep South's turn toward a peaceful solution of its racial problems. What we do know is that the rioting and insurrection in Oxford on September 30, 1962, was the worst of many bad days in the Deep South marked by bloodshed, bombings, and church burnings. If the indictment may be dismissed in the interest of the public, that interest should be tested by the significance to the public of Gov-

---

the show cause order and the order charging criminal contempt. On the contrary, they have assiduously refrained from replying to, or discussing, Government counsel's comments on this aspect or suggesting that we should recuse ourselves. To be sure, a jury trial, either mandatory or discretionary, either before this Court or upon a reference to the two District Courts in Mississippi, is earnestly sought. But if it is to be tried by Judges, no complaint is uttered that it falls to our lot, rather than imported, certified Judges, to assume the responsibility.

5. During all of this jousting, Governor Barnett has not yet had to face up to a formal plea of guilty or not guilty and, for that matter, he has yet to appear before this Court (save by counsel) though repeatedly ordered in person to do so.

6. I agree with Judge Wisdom's analysis (Part III of his dissent) of Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300.

7. I agree with what Judge Wisdom says in Part IV of his dissent about interposition, the likely consequences of Governor Barnett's acknowledged actions, and the necessity that all state officials from Governor to the constable "must know that they cannot with impunity flout federal law." Likewise, I concur in Part VI which points out so clearly an unquestioned liability for accrued civil sanctions and the inescapable fact that Meredith was admitted, not by reason of the Governor's "substantial compliance" with our decree, but by the superior force of military arms.

ernor Barnett's actions on September 30, 1962. On that day in Oxford, Mississippi, the Governor of the State flouted explicit orders of this Court, struck a blow against American federalism, and defied the Nation.

## I.

The Court does not purport to base its holding on any principle of law. The Court bases its holding on its confidence in a prescient majority's knowledge of what is best for the public. Working with what Dr. Gallup would consider a statistically small number for a reliable poll, the Court dismisses the indictments because its 4/3 poll indicates that the public reaction would be adverse to a trial of the defendants at this time.

The Court is not sitting in equity; the defendants are accused of *criminal* contempt. In order, therefore, to dismiss this case, the Court had to start with the assumption that criminal contempt proceedings, although a prosecution for a public wrong, are so unlike other criminal proceedings that the case may be dismissed, after indictment and before trial, whenever the Court concludes that dismissal is in the public interest. Two years ago, however, this case was enough like other criminal prosecutions for the Court to divide evenly on the question whether the defendants are entitled to a jury trial under Article III and the sixth amendment.

In arriving at its value judgment as to whether further prosecution would be in the public interest, the Court gave weight to the high state office Governor Barnett once held and Governor Johnson now holds, the assumed adverse effect a trial might have on federal-state relations, the defendants' "substantial compliance" with the orders of the Court (a reversal of the Court's thinking that will come as a surprise to the defendants), and the degree of felt necessity for prosecution since it is "highly improbable that other persons might hereafter commit" similar acts. *But this Court weighed all of these considerations no less than four times.* November 15, 1962, long after Meredith had registered at the University of Mississippi, the Court, with only one judge dissenting, directed the Department of Justice to file criminal contempt proceedings against Ross R. Barnett and Paul B. Johnson, Jr. December 21, 1962, the Court re-weighed these considerations when it issued the show cause order for criminal contempt. No matter, the majority says, there have been changes in "conditions" since 1962. Turning inward for calipers, the majority has measured the effect of these changes on the general attitude of the public, the reaction of public officials, and the probabilities of high state officials' interfering in the future with federal court orders.

Since there have been several occasions since 1962 when publication of such an opinion coincident with certain unpredictable events in this circuit might have raised questions as to the ability of the majority to measure public reaction and foresee the future, timing is everything. The majority finds that the Supreme Court's general amnesty decree for sit-in trespassers in Hamm v. City of Rock Hill makes it appropriate *now* to "close a chapter". I doubt whether we have reached the close of the chapter. But I know that we are a long, long way from the end of the book.

## II.

It is evident that the decisional process of the majority requires a precision in crystal-gazing and clairvoyant timing that permits no latitude for cloud or haze on the crystal ball. I speak seriously, not facetiously. I say that if the rightness of this decision teeters on the ability of the majority to read not only the collective mind of the Public but the minds of past, present, and future high state officials, and the extent to which lesser officials follow executive leadership, there is something wrong with basing this decision on the majority's appreciation of what is in the public interest.

As every judge knows, there is a certain amount of policy-making in decision-making. This process is especially ap-

parent in cases involving the due process, equal protection, and interstate commerce clauses and other broad concepts that are part of the Constitution as a living organism. Here, however, the Court is not following a prescribed course requiring it to interpret the Constitution or statutes, and is not fact-finding after a hearing. The Court is acting on its own, contrary to a course of action the Court itself chose after careful consideration of all of the factors now before us.

The Court is less like a court than it is like St. Louis. The good French king used to sit under a spreading oak tree, not presiding even-handedly as a judge at a trial, but dispensing justice subjectively, arbitrarily, hit-or-miss, according to his fancy of the moment as to what was best for his subjects and when it was best for him to tell them about it. Coming closer home, the law in the Court's decision is like the Law West of the Pecos.

### III.

Hamm v. City of Rock Hill, 1964, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300, lends no support to the Court's action. In that case the Supreme Court abated pending trespass convictions "in accordance with the long-established rule" (370 U.S. at 317, 85 S.Ct. at 392) that "convictions on direct review at the time the conduct in question is rendered no longer unlawful by statute" may be abated (379 U.S. at 312, 85 S.Ct. at 389). There was a serious question as to the application of the principle of abatement because the convictions were in state courts and the abating statute was a federal statute, the Civil Rights Act of 1964. The majority of the Court overcame this difficulty by resorting to the Supremacy Clause; it was clear that the convictions, if federal, would abate. The comment on "policy" and the "public interest" refers to the declaration of policy in the Civil Rights Act of 1964. As the Court pointed out, "the public policy of the country is to prohibit discrimination in public accommodations as therein defined, [and therefore] there is no public interest to be served in the further prosecution of the petitioners". 379 U.S. at 317, 85 S.Ct. at 392. There is not the remotest implication in the Supreme Court's opinion that anyone on the Court entertained the notion that the sit-in cases should or could be dismissed on the majority's guess that there would be an adverse public reaction to further prosecution of the trespassers. Whether one agrees or disagrees with Hamm v. City of Rock Hill, it is a principled decision resting on an analysis of prior decisions, legal reasoning, and accepted judicial methodology. It is a typical example of the decisional process. It does not rest on the vagaries of a transcient majority's benevolent excursion into the Public Mind.

The Court's inability to cite any precedent is in itself an indication of the impropriety of stopping short of a trial after indictment. In each of the two decisions the Court did cite as authority, the defendant was tried and found guilty of criminal contempt. In re Fletcher, 4 Cir. 1954, 216 F.2d 915; MacNeil v. United States, 1 Cir. 1956, 236 F.2d 149. In Fletcher the court observed:

"It becomes the duty of the judge to take affirmative action when the lawful commands of the court are defied." 216 F.2d at 917.

In MacNeil the court said:

"It would appear from these authorities, and indeed from the very nature of the judicial function, that the trial court can have only a public as distinguished from a private interest in the enforcement of its own decrees. It seems to us, therefore, that regardless of what label may be appended to the proceedings by the court, any action of contempt initiated by the court of its own motion must be regarded as criminal in nature for the vindication of the court's authority and the punishment of the public wrong." 236 F.2d 149 at 154.

### IV.

Fletcher and MacNeil underscore the fundamental weakness in this Court's position. This Court speaks of a con-

tempt case as "a sui generis proceeding for the protection of the integrity of the Court". So it is. And there is no doubt that a contempt proceeding has play in the joints. The Court holds, therefore, that in "light of the substantial compliance with the orders of the Court, it would appear that considerations of respect for the Court do not require the further prosecution of the criminal contempt proceedings". But this case involves more than considerations of respect for this Court.

The offense occurred at a time calling for moral leadership of the highest order. No great clairvoyance was needed to foresee death and disorder resulting from the confrontation of two armed forces. No one can say that the rioting and insurrection that took place September 30, 1962, in Oxford, Mississippi, and the death and disorder that have occurred in many other places in the South since that insurrection, were not due, at least in part, to the imprimatur the Governor of Mississippi placed on lawless defiance of the federal courts.

The judges in the majority have greater confidence in their ability to read the future than I. I cannot say as the Court says, "[i]t is highly improbable that other persons will hereafter commit acts similar to those herein charged". I say that a person who commits the acts with which Barnett is charged must be called to account. If he should be found guilty and punished, that punishment may deter others from committing similar acts. That at least is the theory on which criminal penalties rest.

This action is cast in the form of contempt of this Court. But the significance of the case for the public lies in the fact that within the setting framing the action the contempt charged was, in effect, *the contempt of a Governor of a State against the Nation—against American federalism, as established in the Constitution and as defined by the federal courts.* The serious threat Governor Barnett posed was to the constitutional relationship of the States to the National Government. A public wrong of such enormity carries with it a corresponding and unshirkable duty on the federal court to vindicate the rights of the Nation by bringing the alleged contemnor to trial.

The confrontation should have been a duel with drawn pencils between the Governor of Mississippi and the United States Attorney General in the Mississippi Law Journal. Or it should have started and stopped in the courts, as well it might have, when the University's Board of Trustees, with dignity and grace, agreed in open court to accept Meredith at the University. Unfortunately, Governor Barnett insisted upon a confrontation in the streets of Oxford and on the campus of the University. There was more at issue, therefore, than an affront to this Court's dignity when Ross Barnett, as the head of the State of Mississippi, mobilized sheriffs, highway troopers, and local police officers *and by force of arms overcame United States marshals enforcing the law.*

The Governor of Mississippi, trained in the law, knew or should have known that the Supremacy Clause makes hash of the so-called Doctrine of Interposition. All informed persons know that this political poppycock has never been recognized in a court of law. But the uninformed, the uneducated, the very persons likely to resort to violence, were certain to be misled when their chief executive "interposed" himself between the United States and the University of Mississippi.

Ross Barnett happened to be Governor of Mississippi at an unfortunate time. It would be a mistake to overestimate his place as an obstructionist in the long-run solution of the complex problem of national social adjustment to the changing relationship of the races. What cannot be overestimated, however, in a short-run or long-run solution, is the importance of federal courts' standing fast in protecting federally guaranteed rights of individuals. To avoid further violence and bloodshed, all state officials, including the governor, must know that they cannot with impunity flout federal law.

The Civil Rights Act of 1964 cuts deep into customs that have regulated lives from cradle to coffin. But this law has not been in effect long enough to have

had any wide and severe impact. The country is at the threshold of voluntary compliance with this law. If Congress should adopt the proposed Voting Rights Act of 1965, that law too will change many local customs and further exacerbate state-federal frictions. Southern governors and federal courts may be in for many, many long hot summers.

I cannot see into the unknown. But the dark realities of the past militate against the Court's taking a rosy, relaxed view of the future.

I have concentrated on Governor Barnett because at most of the critical times he preempted the center of the stage. In spite of my strong feeling that he should be tried, I do not intimate that he is guilty of *criminal* contempt. "Wilfulness" is an essential element of the offense distinguishing it from civil contempt. In the absence of proof of his wilful contempt, in a fair trial before the Court, Barnett is entitled to the benefit of the presumption of innocence.

An action involving indirect criminal contempt is like any other criminal proceeding in that vindication of the Court's power need not be immediate. But it must be as certain as death and taxes.

In 1962 this Court concluded that the effectiveness of federal courts and the proper functioning of the federal system depend on a governor's being treated as an ordinary citizen when he flouts federal judicial decrees. The lapse of time only increases the urgency for prompt vindication of federal authority.

## VI.

I see no justification whatever for relieving Barnett of his obligation to comply with the judgment against him for civil contempt. On September 28, 1962, this Court found Barnett in civil contempt of its order of September 25, 1962.[1] We imposed a fine of $10,000 a day unless, before October 2, 1962, he had shown the Court that he was fully complying with the order and had notified all of the officers under his jurisdiction to cease interfering with the orders of the courts and to cooperate in the admission of Meredith to the University of Mississippi. Barnett made no pretense of complying with this order of September 28. On October 2, he compounded his contempt by failing to appear before the Court, after having been summoned, and instructed his attorney to advise the

---

1. The order of September 28, 1962, in part recited:

"Before TUTTLE, Chief Judge, and HUTCHESON, RIVES, JONES, BROWN, WISDOM, GEWIN and BELL, Circuit Judges.

\* \* \* \* \*

"IT IS ORDERED, ADJUDGED AND DECREED THAT:

"Ross R. Barnett is in civil contempt of the temporary restraining orders of this Court entered September 25, 1962; that such contempt is continuing; and that Ross R. Barnett shall be committed to and remain in the custody of the Attorney General of the United States and shall pay a fine to the United States of $10,000 per day unless on or before Tuesday, October 2nd, 1962 at 11:00 A.M. he shows to this Court that he [is] fully complying with the terms of the restraining orders, and that he has notified all law enforcement officers and all other officers under his jurisdiction or command:

"(a) To cease forthwith all resistance to and interference with the orders of this Court and the District Court for the Southern District of Mississippi;

"(b) To maintain law and order at and around the University and to cooperate with the officers and agents of this Court and of the United States in the execution of the orders of this Court and of the District Court for the Southern District of Mississippi to the end that James H. Meredith be permitted to register and remain as a student at the University of Mississippi under the same conditions as apply to all other stuents.

"Nothing herein shall prevent a later assertion of a charge of criminal contempt against Respondent.

"Jurisdiction is hereby reserved for such other and further orders as may be appropriate.

"Judges Jones, Gewin and Bell dissent from that portion of the judgment imposing a fine upon the Respondent."

Court that he had *not* purged himself of contempt.[2]

Meredith registered at the University of Mississippi October 1, 1962. To win this battle, the United States Army had more soldiers under arms at Oxford, Mississippi, or held close by in reserve, than George Washington in the Revolutionary War ever commanded at one time.[3]

\* \* \*

There is an unedifying moral to be drawn from this case of *The Man in High Office Who Defied the Nation:* The mills of the law grind slowly—but not inexorably. If they grind slowly enough, they may even come, unaccountably, to a gradual stop, short of the trial and judgment an ordinary citizen expects when accused of criminal contempt. There is just one compensating thought: Hubris is grist for other mills, which grind exceeding small and sure.

2. October 2, 1962, counsel for Governor Barnett, in answer to questions from the Court, stated that Governor Barnett was in full compliance with the Court's orders and would fully comply with the orders of the Court in the future. October 12, 1962, counsel for Governor Barnett, in open court, retracted their statements that Governor Barnett intended in the future to comply with the orders of the Court. October 19, 1962, Governor Barnett, through his counsel, filed a response to which was attached the following statement:

"The full statement follows:

"*I have never taken the position that I have purged myself, nor have I authorized anyone to take such a position on my behalf.* My position is that I have upheld the law and am not in contempt of any Court.

"It is my position that my first obligation, as the Governor of Mississippi, is to my oath of office to uphold the Constitution and Laws of Mississippi and the Constitution of the United States, and to preserve law and order. The people of Mississippi built this University and their schools at great sacrifice. These properties and their control belong to the State, and the Supreme Court of the United States has expressly so ruled in Waugh v. [Board of Trustees of] University of Mississippi, 237 U.S. 589 [35 S.Ct. 720, 59 L.Ed. 1131].

"All of the actions that I have taken were taken because of my duty to obey my oath as Governor, and as long as I am the Governor of this State, all actions that I will take in the future will be in obedience of this oath.

"I conscientiously believe that it is my duty, as Governor, deliberately, solemnly, and fully, and free from the control or interference of anyone to exercise, according to my own judgment and my own discretion, the duties the people have entrusted to me as their Governor, I would not be faithful to my oath of office, should I surrender to any Federal or other Courts the rights to exercise those discretionary powers the law has placed in me, to maintain law and order, to prevent a breach of the peace, violence or bloodshed, and my discretion must remain free. I shall ever and eternally stand for the exercise of my own discretion in my own right, and shall repudiate the right of anyone to take that discretion away from me and exercise it in my behalf. The Constitutions of the United States and the State of Mississippi provide for the separation of the Judicial, Executive and Legislative functions. The people have never given any right to any one of these departments to act for the other.

"If any act that I have done as Governor or any act I shall do as Governor in the future causes any person to believe that I have violated his right, the Courts are open to challenge me again in a proper court proceeding. Mississippi has not yet had her day in Court.

"My position is based upon the Constitution of the United States and the Constitution and Laws of the State of Mississippi. My every decision in this matter has been formed after careful and deliberate consideration of what I believe to be the law. *I have not changed my position in the slightest degree. I shall never apologize for anything I have said or done in this regard because I have acted in good faith in discharging the duties entrusted to me.* My conscience is clear. I am moved only by deep and abiding affection for the welfare of all the people of Mississippi. I shall ever keep the faith that the people of Mississippi have entrusted to me as their Governor." (Emphasis supplied.)

3. So an historian asserts. Silver, Mississippi: The Closed Society 122 (1964).