**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Larry DICKINSON and Gibbs Adams,
Defendants-Appellants.**

**No. 71–3469.**

United States Court of Appeals,
Fifth Circuit.

Aug. 22, 1972.

---

For decision after remand see 465 F.Supp. 496.

Frank M. Coates, Jr., Baton Rouge, La., for defendants-appellants.

Gerald J. Gallinghouse, U. S. Atty., Mary Williams Cazalas, James D. Carriere, New Orleans, La., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and BELL and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The civil libertarians' nightmare with which we here are haunted presents a classic confrontation between "two of the most cherished policies of our civilization"[1]—freedom of the press, encased in the armor of the First Amendment, pitted against the right of the accused to a fair and impartial trial, shielded by the Sixth Amendment and reinforced in this case by a protective order of the District Court which is the real cause of the battle. In the skirmish that ensues, both sides glimpse victory and both sides taste defeat. But the Day of Armageddon has not yet dawned on this great conflict, and accordingly at our hands there is a forced withdrawal to the District Court.

*A Prohibited Publication*

Cast against a backdrop of assassination and political intrigue, the case began when Frank Stewart, a VISTA worker active in civil rights endeavors on behalf of the black community of Baton Rouge, Louisiana, was indicted in Louisiana State Court on a charge of conspiring to murder the Mayor of Baton Rouge. Alleging that the State Court prosecution was completely groundless and intended solely and exclusively to harass the accused in order to suppress his exercise of First Amendment rights, Stewart, calling on the full arsenal of Federal Civil Rights Statutes, sought to foreclose the pending State criminal prosecution by requesting injunctive relief from the United States District Court for the Eastern District of Louisiana. The District Court de-

1. Bridges v. California, 1941, 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192, 201.

clined to restrain the State Court (Stewart v. Dameron, E.D.La., 1971, 321 F. Supp. 886), but this Court vacated that order and remanded the case for a new evidentiary hearing, since "Stewart had not been allowed to put on any evidence concerning his allegations of bad faith prosecution and harassment" at the original proceeding. Stewart v. Dameron, 5 Cir., 1971, 448 F.2d 396.

In accordance with the mandate of this Court, the District Court held a Younger v. Harris [2] hearing on November 1, 1971, limited solely to the question of whether the State prosecutorial motive was legitimate or contrived. This hearing likewise resulted in a holding for the State, but again the District Court's order was reversed on appeal and the case remanded for another evidentiary hearing. Stewart v. Dameron, 5 Cir., 1972, 460 F.2d 278.

Meanwhile, during the second hearing, the opening shot of the present battle had been fired. Dickinson and Adams, appellants, were newspaper reporters, employed by the City Press and assigned to cover that hearing for the *Morning Advocate* and the *State Times*. During the course of the morning's proceedings the Judge pronounced this order from the bench:

"And, at this time, I do want to enter an order in the case, and that is in accordance with this Court's Rule in connection with Fair Trial—Free Press provisions, the Rules of this Court,

"It is ordered that no, no report of the testimony taken in this case today shall be made in any newspaper or by radio or television, or by any other news media. This case will, in all probability, be the subject of further prosecution; at least, there is the possibility that it may. In order to avoid undue publicity which could in any way interfere with the rights of the litigants in connection with any further proceedings that might be had in this or other courts, there shall be no reporting of the details of any evidence taken during the course of this hearing today.

"This order is made subject to the sanctions provided by law in the event of any violation of this order.

"Now, gentlemen, by that I do not mean that the press cannot report the fact that a hearing has been held or that a hearing is being held, but it's obvious that the testimony here today could impede another court in its progress toward selecting a jury in this case if such became necessary. Consequently, I do not want—and this order means that there shall be no reporting of the details of the evidence taken in this court today or in any continuation of this trial—of this hearing."

Notwithstanding that order, and with admitted knowledge that their actions violated its terms, Dickinson and Adams wrote articles for their newspapers summarizing the day's testimony in detail. Accordingly, a show cause order was issued and following a hearing thereon, the District Court found the appellants guilty of criminal contempt for knowingly having violated the November 1 order. Each defendant was sentenced to pay a fine of $300.00. This appeal resulted.

*Free Press vs. Fair Trial— Constitutionality Of The Court's Order*

■ The initial question with which we are confronted concerns the constitutionality of the District Court's order. Sympathetic as we are to the legitimate objective earnestly pursued by the conscientious Trial Judge (preservation of an impartial venire within the local community whenever the state criminal prosecution should reach trial), we must conclude that a blanket ban on publication of Court proceedings so far transgresses First Amendment freedoms that any such absolute proscription "cannot withstand the mildest breeze emanating from the Constitution." Southeastern

2. 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669.

Promotions Ltd. v. City of West Palm Beach, 5 Cir., 1972, 457 F.2d 1016, p. 1017.

■ We start, of course, with the proposition repeatedly reaffirmed by the Supreme Court that "a trial is a public event. What transpires in the courtroom is public property. * * * Those who see and hear what transpired may report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." Craig v. Harney, 1947, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546, 1551; Stroble v. California, 1952, 343 U.S. 181, 193, 72 S.Ct. 599, 96 L.Ed. 872, 882; Estes v. Texas, 1965, 381 U.S. 532, 541, 85 S.Ct. 1628, 14 L.Ed.2d 543, 549; Sheppard v. Maxwell, 1966, 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600, 613.[3] Moreover, "reporters of all media * * * are plainly free to report whatever occurs in open court through their respective media." Estes, supra, 381 U.S. at 541–542, 85 S.Ct. at 1632.

■ Particularly is maximum freedom of the press required where the trial is intended to "determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." Wood v. Georgia, 1962, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569, 580. "The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of

public events and occurrences, including court proceedings." Estes, supra, 381 U.S. at 539, 85 S.Ct. at 1631. Therefore, "particularly in matters of local political corruption and investigations is it important that freedom of communications be kept open * * *." Wood, supra, 370 U.S. at 390, 82 S.Ct. at 1373.

■ The Younger v. Harris hearing generating the present case, involving as it did allegations of bad faith, harassment, political machinations, and racial motivation on the part of the State prosecutorial officials, was peculiarly one of public concern. In fact, it was precisely the widespread interest in the case which led the Court to issue the controversial order. Accordingly, in the circumstances of this case, the prior restraint of the press imposed by the questioned order "comes to this Court bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593; Organization for a Better Austin v. Keefe, 1971, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1, 6; New York Times Co. v. United States, 1971, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822, 824; Near v. Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357. Any less stringent standard would forsake the unequivocal commands of the First Amendment. Bridges, supra, 314 U.S. at 263, 62 S.Ct. 190, 86 L.Ed. 192; Craig, supra, 331 U.S. at 373, 67 S.Ct. 1249.

■ Of course, the accused has constitutional rights, too, and particularly important among these are rights to a

3. The principle that Courts may no more censor newsmen than may any other institution of Government finds vindication not only in the literal wording of the First Amendment and interpretating cases, but also in general experience. "A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any direct limitations on freedom traditionally exercised by the news media for '[w]hat transpires in the courtroom is public property.'" Sheppard, supra, 384 U.S. at 350, 86 S. Ct. at 1515, quoted in Phoenix Newspaper, Inc. v. Superior Court, 1966, 101 Ariz. 257, 418 P.2d 594.

speedy trial before a fair and impartial tribunal in the venue where the alleged offense occurred. Clearly, pervasive and irresponsible news coverage of a pending criminal proceeding can so inflame and prejudice a community that it becomes virtually impossible to select an impartial jury therefrom. And without a doubt it is the Trial Court's responsibility to protect the defendant from such inherently prejudicial influences which threaten the fairness of his trial and an abrogation of his constitutional rights. *Sheppard, supra; Estes, supra;* Rideau v. Louisiana, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663. "Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial." Shepherd v. Florida, 1951, 341 U.S. 50, 53, 71 S Ct. 549, 550, 95 L.Ed. 740, 743 (Jackson, J. concurring).

■ Thus does Alexander again confront the Gordian Knot. For our history demands that breaches of the unqualified commands of the First Amendment cannot be tolerated and freedom of the press must be given the broadest scope that a liberty-loving people can allow. Pennekamp v. Florida, 1946, 328 U.S. 331, 347, 66 S.Ct. 1029, 90 L.Ed. 1295, 1304;[4] *Bridges, supra.* On the other hand, our fundamental concepts of absolute fairness in trials dictate that the environment within which justice is administered must be maintained unpolluted by the potential infamous notoriety and biased predilections which a completely unfettered but omnipresent press can irrevocably engender in an age of the mass media. *Sheppard, supra; Estes, supra; Rideau, supra.* The balance is delicate with so much at stake, and the equipollence of the interests de-

fies a simple resolution by mere judicial tug-of-war, with the "lesser" bantam liberty giving way to a weightier, more Herculean one. Cf. Karr v. Schmidt, 5 Cir. (en banc), 1972, 460 F.2d 609.

### The Clash An Ancient One

But the clash between the First and the Sixth Amendments is by no means endemic only to a modern age of electronic technology and instantaneous dissemination of information. Rather it is a conflict dramatically traced by our history. The District Court, in promulgating his order, relied on the Free Press —Fair Trial Rules for the Eastern District of Louisiana. To perceive why his order overreached those Rules to constitutionally unsupportable extents, it is necessary to understand the historical context in which the Rules came into being.

Our tale begins in 1830 when United States District Judge James H. Peck was tried on Articles of Impeachment for having imprisoned and disbarred one Lawless for publishing a criticism of one of Judge Peck's opinions in a case which was then pending on appeal. Although Judge Peck was eventually acquitted (despite an impassioned prosecution by James Buchanan), Congress acted the very next day to limit severely the Federal Court's power to punish summarily contempt by publication. See Nye v. United States, 1941, 313 U.S. 33, 45–46, 61 S.Ct. 810, 85 L.Ed. 1172, 1179, and Nelles and King, Contempt by Publication in the United States, 28 Col.L. Rev. 401, 409 et seq. for the history of the Judge Peck episode.

The years that followed were marked by a feeling of jealous solicitude for freedom of the press [5] in areas touching

---

4. "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice."

5. This is not to say that the press was not subjected to devastating criticism. Consider, for example, the following statement from the letters of Thomas Jefferson as set out in Padover, Democracy,

150–151: "I deplore . . . the putrid state into which our newspapers have passed, and the malignity, the vulgarity, and mendacious spirit of those who write them. . . . These ordures are rapidly depraving the public taste.

"It is however an evil for which there is no remedy. Our liberty depends on the freedom of the press, and that cannot be limited without being lost."

upon the administration of justice. A temporary departure from the previous consistent holdings favoring publication of commentary on court proceedings occurred in 1918 when the Supreme Court in Toledo Newspaper Co. v. United States, 1918, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186, greatly enlarged the District Court's power to punish contemptuous publications by adopting a "reasonable tendency to obstruct the administration of justice" standard for determining whether or not a particular publication was contemptuous. The *Toledo Newspaper* rule proved aberrational, however, and was shortlived. In Nye v. United States, *supra*, it was specifically overruled.

During the very next term after *Nye* the Supreme Court reaffirmed and, in fact, strengthened the *Nye* holding in Bridges v. California, *supra*. In that case, Mr. Justice Black, writing for the majority, engrafted the "clear and present danger" test of *Gitlow* [Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138], *Schenck* [Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470] and *Whitney* [Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095] to the contemptuous publication of court proceeding situation, declaring that even (or perhaps especially) within the courtroom context "minor matters of public inconvenience or annoyance [cannot be transformed] into substantive evils of sufficient weight to warrant the curtailment of liberty or expression. * * * [T]he substantive evil must be extremely serious and the

degree of imminence extremely high before utterances can be punished." *Bridges, supra*, 314 U.S. at 263, 62 S.Ct. at 194. This zeal in preserving freedom of the press was echoed in *Pennekamp, supra*. "We think the specific freedom of public comment should weigh heavily against a possible tendency to influence cases." 328 U.S. at 347, 66 S.Ct. at 1037. And it was again underscored in Craig v. Harney, *supra*. "Those who see and hear what transpired [in open court] can report it with impunity." 331 U.S. at 374, 67 S.Ct. at 1254, 91 L.Ed. 1546.[6]

### Problems Of A New Era

At about this time, however, modern technology catapulted the news industry into the electronic age, endowing the press with theretofore unimagined powers of instantaneous dissemination of information, literally to the entire world. With the advent of this capacity for mass communications, the potential of the news media to influence the outcome of court proceedings, long recognized as a likelihood, was finally seen really to be more than theoretical.[7]

Mr. Justice Frankfurter had early warned that press exploitation of court proceedings could so inflame potential jurors that a conviction could not be obtained in the local community consistent with due process. See *Pennekamp, supra*, 1946, 328 U.S. at 350, 66 S.Ct. 1029, 90 L.Ed. 1295 (Frankfurter, J., concurring); Maryland v. Baltimore Radio Show, 1950, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (Frankfurter, J., dissent-

6. "The history of the power to punish for contempt (see Nye v. United States, *supra*; Bridges v. California, *supra*) and the unequivocal command of the First Amendment serve as constant reminders that freedom of speech and of the press should not be impaired through the exercise of that power, unless there is no doubt that the utterances in question are a serious and imminent threat to the administration of justice." 331 U.S. at 373, 67 S.Ct. at 1253.

7. Indeed, the charge that inflammatory newspaper articles had prejudiced the de-

fendant's opportunity to secure a fair trial is by no means recent. In the 1807 trial of Colonel Aaron Burr before Chief Justice Marshall, for example, counsel had urged that biased articles carried in the Alexandria *Expositor* and other newspapers had implanted preconceived notions of the defendant's guilt in the minds of the jurors. United States v. Burr, 25 Fed.Cas. pp. 2, 50, Nos. 14692a, 14692g (C.C.D.Va.1807). See also United States v. Holmes, 26 Fed.Cas. pp. 360, 363, No. 15383 (C.C.E.D.Pa.1842) Free Press—Fair Trial, 45 F.R.D. 391, 394, n. 2 (1968).

ing from denial of petition for writ of certiorari); Shepherd v. Florida, *supra*, 1951, 341 U.S. at 50, 71 S.Ct. 549, 95 L. Ed. 740 (Jackson, J., with whom Frankfurter, J., joins, concurring); Stroble v. California, *supra*, 1952, 343 U.S. at 198, 72 S.Ct. 599, 96 L.Ed. 872 (Frankfurter, J., dissenting). That position did not achieve authoritative judicial acceptance, however, until 1959, when, apparently for the first time, the Supreme Court reversed a criminal conviction solely because of prejudicial news articles read by the jurors. Marshall v. United States, 1959, 360 U.S. 310, 79 S. Ct. 1171, 3 L.Ed.2d 1250.

Though that case was decided on supervisory rather than constitutional grounds, the Court two years later invoked the Due Process Clause to invalidate a State murder conviction where continued adverse publicity had created an atmosphere of "sustained excitement," "strong prejudice" and "public passion." Irvin v. Dowd, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. Shortly thereafter, the Court recognized the inherent impossibility of obtaining an impartial jury in a community where a video tape replay of the defendant's confession had been televised to an estimated 100,000 home viewers. Rideau v. Louisiana, *supra*.

The next few years saw the courts flooded with a torrent of complaints that prejudicial publicity had prevented the convicted defendant from obtaining a fair trial. Over 100 such cases are reported for the brief two-year span from January, 1963 to March, 1965. See R. Ainsworth, Fair Trial—Free Press, 45 F.R.D. 417, 419 (1968). As a result of this flurry of litigation, several federal and local law enforcement agencies, bar associations, national, state and local

press groups and judicial conferences convened committees to study the problem and to propose solutions.[8] Despite this intense activity, however, effective measures to curb prejudicial publicity while protecting freedom of the press were virtually non-existent. Report of the Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 45 F.R.D. 391, 399 (1968).

## *Sheppard v. Maxwell*

Such was the situation when, in 1966, the Supreme Court announced its landmark decision in the case of Sheppard v. Maxwell, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Sam Sheppard's trial for the murder of his wife had been carnivalized by relentless, irresponsibly over-anxious reporters who displayed a remarkable insensitivity to accuracy, fairness or justice. Before the trial pervasive news coverage had branded Sheppard "a bare-faced liar," a "Jekyll-Hyde" and a "perjuror". A picture of Mrs. Sheppard's bloodstained pillow was "doctored" and then published on the front page of a local newspaper. Much attention was devoted to the extrajudicial claims of a woman convict that Sheppard was the father of her illegitimate child. During the trial, bedlam reigned at the courthouse as hundreds of reporters and photographers jammed the entire courtroom, causing constant confusion, disruption and commotion. A radio broadcast booth was established adjacent to the jury room. Jurymen, witnesses, attorneys and even the Judge were "forced to run the gauntlet of reporters and, photographers each time they entered or left the courtroom." 384 U.S. at 355, 86 S.Ct. at 1518. The newsmen exploited the "free reign" which had been allowed them and turned

8. Some of the better known commissions included the Reardon Committee of the American Bar Association's Advisory Committee on Fair Trial and Free Press, the Medina Committee of the Association of the Bar of the City of New York, and the Special Committee of the Board of Directors of the American Newspaper Publishers Association. Additionally, both the Judicial Conference of the United States and the Attorney General of the United States, as well as a multitude of state bar associations and press associations, made in-depth surveys of the problems and proposed partial solutions.

the trial into a "Roman holiday". 384 U.S. at 356, 86 S.Ct. 1507.

Finding that the "state trial judge did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom," 384 U.S. at 363, 86 S.Ct. at 1522, the Supreme Court ordered a writ of habeas corpus releasing Sheppard from custody. In so holding the Supreme Court laid to rest the notion that the trial court was impotent to protect the defendant from prejudicial influences of an omnipresent press. Indeed the Court suggested a number of ways in which the Courts could "protect their processes from prejudicial outside interferences." 384 U.S. at 363, 86 S.Ct. at 1522. More importantly, the Court in *Sheppard* not only sanctioned efforts to effect this insulation but *demanded* that trial courts adopt "strong measures to insure that the balance is never weighed against the accused." 384 U.S. at 362, 86 S.Ct. at 1522. "If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception." 384 U.S. at 363, 86 S.Ct. at 1522.

## Free Press—Fair Trial Rules

In response to the mandate of *Sheppard*, the Judicial Conference of the United States took action. Its standing Committee on the Operation of the Jury System, headed by Judge Irving Kaufman and a specially appointed Subcommittee to Implement Sheppard v. Maxwell, chaired by Judge Edward Gignoux, undertook two years of deliberations, research and collaboration between the Subcommittee and the full Committee. In 1968 a comprehensive report was published outlining specific recommendations designed to accommodate the news media's right to report with the defendant's right to trial by an impartial jury, all within a framework of constitutional doctrine. See 45 F.R.D. 391 (1968). These recommendations became known as the Kaufman Committee Report.

The Kaufman Committee Report was subsequently adopted by the Judicial Conference of the United States and implemented by Local "Free-Press—Fair-Trial" Rules promulgated by each District Court. The Report and the Local Rules embodying it, however, must be viewed in light of the historically delicate balance the recommendations sought so zealously to preserve. Painstakingly harmonizing history with contemporary realities, freedom of the press with fundamental fairness of trials, the Kaufman Committee explored every aspect of the problem and its Report synthesizes all relevant considerations. The result is a catalogue of explicit proposals, most taken directly from the *Sheppard* opinion, inventorying the tools available to the trial Judge in discharging his affirmative duty to protect the accused from prejudicial publicity and disruptive influences at trial, but carefully avoiding any but the most limited, tangential and indispensable controls on the press.

Indeed, the *Sheppard* opinion had specifically declined to "place any direct limitations on the freedom traditionally exercised by the news media"[9] and had expressly asserted that "of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom."[10] In recognition of those dictates the Kaufman Committee's recommendations deliberately eschew any suggestions for direct control of newsmen except in two very carefully delineated situations—(i) the seating of news media representatives so as to minimize disruptive influences during trial and (ii) the televising, photographing or broadcasting from the courtroom. Other than those exceptions, the Kaufman Committee's recommendations are directed exclusively to parties,

9. 384 U.S. at 350, 86 S.Ct. at 1515.

10. 384 U.S. at 362–363, 86 S.Ct. at 1522.

witnesses, attorneys, jurors, and courthouse personnel. Of course, the provision for special orders in widely publicized and sensational cases,[11] on which the District Court here relied so heavily, provides great elasticity and room for judicial inventiveness. However, the Report makes clear that this provision was intended to apply only "where necessary to preserve decorum in and around the courtroom and to maintain the integrity of the trial." More importantly, in an effort to insure that the Rule would be invoked only within the framework of constitutionally permissible limits, the Committee went on to identify certain specific subjects to which orders might be addressed. (See § III(c) (1) of Report at 45 F.R.D. 409–411 and Local Rule 10—Subjects of Special Order, note 11, *supra*). Significantly, none of these permissive special provisions includes a suggestion that the content of news reports might be judicially supervised or otherwise controlled, and the local Rule does not undertake to do so. Without so holding—since no such Rule exists—we have grave reservations whether such a limitation could be promulgated without making impermissibly serious inroads into the purview of the First Amendment. Censorship in any form—judicial censorship included[12]—is simply incompatible with the dictates of the constitution and the concept of a free press.[13]

11. "RULE 9. SPECIAL ORDERS
In a widely publicized or sensational case, the Court on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury, the seating and conduct in the courtroom of spectators and news media representatives, the management and the sequestration of jurors and witnesses, and any other matters which the Court may deem appropriate for inclusion in such an order.

"RULE 10. SUBJECTS OF SPECIAL ORDER
Such a special order may be addressed to some or all of the following subjects:
(1) A proscription of extrajudicial statements by participants in the trial, including lawyers, parties, witnesses, jurors, and court officials, which might divulge prejudicial matter not of public record in the case.
(2) Specific directives regarding the clearing of entrances to and hallways in the courthouse and respecting the management of the jury and witnesses during the course of the trial to avoid their mingling with or being in the proximity of reporters, photographers, parties, lawyers, and others, both in entering and leaving the courtroom and courthouse, and during recesses in the trial.
(3) A specific direction that the jurors refrain from reading, listening to, or watching news reports concerning the case, and that they similarly refrain from discussing the case with anyone, or with one another, during the trial and from communicating with others in any manner during their deliberations.
(4) Sequestration of the jury on motion of either party or the Court, without disclosure of the identity of the movant.
(5) Direction that the names and addresses of jurors or prospective jurors not be publicly released except as required by statute, and that no photograph be taken or sketch made of any juror within the environs of the Court.
(6) Insulation of witnesses from news interviews during the trial period.
(7) Specific provisions regarding the seating of spectators and representatives of news media, including:
a. An order that no member of the public or news media representative be at any time permitted within the bar railing;
b. The allocation of seats to news media representatives in cases where there are an excess of requests, taking into account any pooling arrangement that may have been agreed to among the newsmen."

12. "History affords no support for the contention that the criteria applicable under the Constitution to other types of utterances are not applicable, in contempt proceedings, to out-of-court publication pertaining to a pending case" *Bridges, supra,* 314 U.S. at 268, 62 S.Ct. at 196, 86 L.Ed. 192.

13. Near v. Minnesota, *supra*; Bantam Books, Inc., *supra*; Organization for a Better Austin, *supra*; Chase v. Robson, 7 Cir., 1970, 435 F.2d 1059; State ex rel. Superior Court of Snohomish Cty. v. Sperry, 1971, 79 Wash.2d 69, 483 P.

*Now To The Case At Hand*

Translating that rich history to the case before us, one significant circumstance is readily apparent—no decision, opinion, report or other authoritative proposal has ever sanctioned by holding, hint, dictum, recommendation or otherwise any judicial prohibition of the right of the press to publish accurately reports of proceedings which transpire in open court.[14] Indeed, the *Sheppard* opinion, amid a host of suggestions which inevitably limit the press to some extent, specifically and plainly repudiates the notion that the Trial Judge may also bar news reports of public proceedings. "Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom." 384 U.S. at 362–363, 86 S.Ct. at 1522, 16 L.Ed.2d 600. The Kaufman Committee Report likewise rejects direct influence over the newsmen's domain. "The Committee does not presently recommend any direct curb or restraint on publication by the press of potentionally prejudicial material. Such a curb, it feels, is both unwise as a matter of policy and poses serious constitutional problems." [15]

[redacted] Even if special exigencies might justify curtailment of the right to publish court proceedings in some extraordinary circumstance—and that *if* is a very big one indeed—the present case is peculiarly ill-suited for abandonment of the traditional reluctance of courts to supervise the content of news accounts of public proceedings. In the first place, since the cases make clear that before First Amendment freedoms can be abridged "the substantive evil must be extremely serious and the degree of imminence extremely high," *Bridges, supra,* 314 U.S. at 263, 62 S.Ct. at 194 and that "the fires which [the expression] kindles must constitute an immediate, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil," *Craig, supra,* 331 U.S. at 376, 67 S.Ct. at 1255, 91 L.Ed. 1546, "the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases [particularly in borderline instances]." *Pennekamp, supra,* 328 U.S. at 347, 66 S.Ct. at 1037, 90 L.Ed. 1295. With these guides in mind, it is significant that the hearing here in issue was not before a jury, and trial on the merits was by no means immediate. Nor was there any certainty as to the place of the State Court trial. It is the nature of news that it is so readily forgotten—time can erase impressions, even sensational ones. Thus, while prejudicial news coverage may poison the minds of

2d 608; Oliver v. Postel, 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306, 1972.

14. One possible exception to this broad statement may be found by way of dictum in Mr. Justice White's very recent opinion for the Court in Branzburg v. Hayes, 1972, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 that newsmen "may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." 408 U.S. at 685, 92 S.Ct. at 2658. It seems unlikely that he meant for this dictum to be read too literally, since he immediately cites *Sheppard, Estes* and *Rideau* as support for this proposition. Of course, as we have already pointed out, each of these three cases expressly and explicitly disavows any suggestion that newsmen can be prohibited from publishing reports of what transpires in open court.

15. Footnote 17 of the Report explained, "Both the Reardon and Medina Committees reject an expanded use of the contempt power to control the news media. Because of 'the constitutional problems that would be raised' and 'the inhibitory effect on speech that ought not to be prohibited,' the Reardon Committee proposes the use of the contempt power only, 'when a serious threat to the fairness of an ongoing trial by jury is created by an extrajudicial public statement calculated to affect the outcome of that trial.' Reardon Report, Recommendation 4.1, Proposed Final Draft, p. 27. The Medina Committee is of the view that 'as a matter of both constitutional law and policy, * * * extension of the contempt power is neither feasible nor wise. * * *" (Medina Report, p. 11)."

jurors or immediate prospective jurors for the present, the contamination may be only temporary and while allowing the press possibly to generate an inflamed temper in the community is regrettable, this was no indication that change of venue would not likely suffice. Therefore, the District Court's cure was worse than the disease.

Second, the situation which the trial court faced in the present case was in no way the "Roman holiday"—"carnival atmosphere" created by hundreds of reporters at the Sheppard trial, or the "cause celebre"-show-must-go-on environment of the Estes trial, or the total "bombardment of the community with the sights and sounds of a two-day hearing" at the Rideau trial, for example. The order here covered only two reporters whose in-court conduct was unobtrusive and whose articles appeared deeply buried within the oft-overlooked interiors of the daily paper. Of course this was not the object of the Judge's concern relating to possible prejudice in a future trial at another time and place, but the factor of disruption did not warrant the restrictive measures employed.

Third, the public's right to know the facts brought out in this specific hearing was particularly compelling here, since the issue being litigated was a charge that elected state officials had trumped up charges against an individual solely because of his race and political civil rights activities. "Particularly in matters of local political corruption and investigation is it important that freedom of communications be kept open and that the real issues not become obscured * * *." *Wood, supra,* 370 U.S. 390, 82 S.Ct. 1373, 8 L.Ed.2d 569.

Fourth, while the Court's power over particular conduct committed in his presence within the courtroom is unquestioned, the injunction challenged in this case was not directed at any named party or court official involved in the underlying litigation, but rather it sought to control activities of non-parties to the lawsuit—namely, two reporters—in matters not going to the merits of the substantive issues of the ongoing trial or the court's ability to effectuate any ultimate judgment on them.

█ Fifth, a Federal Court's responsibility to protect a State Court defendant from anticipated unconstitutional influences is generally limited to situations where there is an antecedent showing of bad faith harassment or other special circumstances. Younger v. Harris, *supra*, companion cases and progeny. Since the State Courts are presumed to be no less capable of protecting the defendants' constitutional rights in the context of a pending criminal prosecution than is a Federal Court, Becker v. Thompson, 5 Cir., 1972, 459 F.2d 919, it is generally inappropriate for a Federal Court to attempt by way of anticipation to protect the potential defendant from some possible denial of constitutional right by the State Court. See especially, Perez v. Ledesma, 1971, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701. Although this sensitivity to the accused's rights was laudable both in the sense of protection to the accused and in eliminating the possible generation of deplorable community-wide prejudice, the restrictive measures adopted practically put the Federal Judge in the role of policing the climate of the community to insure a sterile trial in the State Court.

█ Finally, there are available alternative cures for prejudicial publicity far less disruptive of constitutional freedoms than an absolute ban on publication. Thus, if as the Judge apprehended, the expected pretrial publicity generated a prejudicial atmosphere which had not abated by time for the State trial, the traditional remedies of continuance or change of venue would be readily available to insure a fair trial. The inconvenience or expense to State or defendant in such a course was not enough to justify the extreme ban on publication.

█ Of course with mass dissemination of news being what it is today there is no way of being positive that

change of venue or postponement by continuance eradicates all prejudice, but with competing values at stake this possibly is not enough. For if allowing the press to publish reports of the proceedings in the present · case carried the prospect of poisoning the minds of potential jurors, it likewise offered the promise of administering an antidote against the societal diseases of corruption, oppression and abuse of power by government officials. Enforced silence in the name of preserving the sterility of a future trial can suffocate the First Amendment, particularly when the very issue then on trial is the serious charge of flagrant, wilfull abuse of power. Tabulating this rich history, these factors add up to our compelled conclusion that the District Court's order banning publication of matters transpiring in open court was constitutionally unacceptable, and hence illegal.

### It Doesn't End Here

The conclusion that the District Court's order was constitutionally invalid does not necessarily end the matter of the validity of the contempt convictions. There remains the very formidable question of whether a person may with impunity knowingly violate an order which turns out to be invalid. We hold that in the circumstances of this case he may not.

█ We begin with the well-established principle in proceedings for criminal contempt that an injunction duly issuing out of a court having subject matter and personal jurisdiction *must be obeyed*, irrespective of the ultimate validity of the order. Invalidity is no defense to criminal contempt. United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884; Howat v. State of Kansas, 1922, 258 U. S. 181, 42 S.Ct. 277, 66 L.Ed. 550; Gompers v. Buck's Stove and Range Co., 1911, 221 U.S. 418, 31 S.Ct. 492, 55 L. Ed. 797; Walker v. City of Birmingham, 1967, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210. "People simply cannot

have the luxury of knowing that they have a right to contest the correctness of the judge's order in deciding whether to wilfully disobey it. * * * Court orders have to be obeyed until they are reversed or set aside in an orderly fashion." Southern Railway Co. v. Lanham, 5 Cir., 1969, 408 F.2d 348, 350 (Brown, C. J., dissenting from denial of rehearing en banc).

It is clear that this principle applies even where the invalidity of the order is of constitutional proportions, as Walker v. Birmingham, *supra*, plainly holds. In *Walker* the contemnors, including Dr. Martin Luther King, had violated an Alabama circuit court ex parte injunction prohibiting participation in street demonstrations planned for the forth coming Easter weekend. Forsaking numerous appellate routes left open for contesting the circuit court's order, the demonstrators marched anyway in knowing disobedience to the injunction and without having taken any judicial steps to dissolve or overturn it. The Supreme Court affirmed the resulting contempt convictions. Admittedly the injunction in *Walker* was merely a judicial paraphrase of an existing municipal ordinance which prohibited street demonstrations without authority of a permit secured from the Commissioner of Public Safety (Eugene "Bull" Conner), which ordinance was shortly declared unconstitutional by a unanimous court in Shuttlesworth v. City of Birmingham, 1968, 394 U.S. 147, 89 S.Ct. 935, 22 L. Ed.2d 162. Nevertheless, the Court, emphasizing that "respect for judicial process is a small price to pay for the civilizing hand of law," 388 U.S. at 321, 87 S. Ct. at 1832, emphatically rejected the suggestion that an individual may disregard a court order simply because the injunction interfered with—albeit impermissibly—his exercise of First Amendment rights. Absent a showing of "transparent invalidity" or patent frivolity surrounding the order, *it must be obeyed* until reversed by orderly review or disrobed of authority by delay or frustration in the appellate process,

regardless of the ultimate determination of constitutionality, or lack thereof.

## Uniqueness Of The Judiciary

 Admittedly, the inviolability of court orders, typified by the *Walker* rule, is unique among governmental commands. When legislators or executive agencies—State or Federal—have transgressed constitutional or statutory bounds, their mandates need not be obeyed. Violators, or course, risk criminal sanctions if their prediction of illegality should fail, but if the directive is invalid, it may be disregarded with impunity. Shuttlesworth v. City of Birmingham, *supra*; Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. In fact, in certain situations, intentional disobedience to the statute may be the only means of obtaining a judicial determination of its constitutionality. See, e. g., Becker v. Thompson, 5 Cir., 1972, 459 F.2d 919; Boyle v. Landry, 1971, 401 U.S. 77, 91 S.Ct. 758, 27 L. Ed.2d 696. Similarly, "one cannot be punished for failing to obey the command of a [police] officer if that command is violative of the Constitution." Wright v. Georgia, 1963, 373 U.S. 284, 291–292, 83 S.Ct. 1240, 1245, 10 L.Ed.2d 349, 355.

 Likewise, disobedience to a Congressional demand for information cannot be punished as contempt of Congress if the demand was constitutionally infirm. Watkins v. United States, 1957, 354 U.S. 178, 197, 77 S.Ct. 1173, 1184, 1 L.Ed.2d 1273, 1289. And obviously, refusal to submit to an order of induction into the armed forces is not punishable where the order issued in violation of the inductee's constitutional or statutory rights. United States v. Wingerter, 5 Cir., 1970, 423 F.2d 1015.

 Significantly, it is only the orders of judicial authorities which must be tested in the courts before deliberate transgression can be excused on an eventual determination that the order was invalid.

The criminal contempt exception requiring compliance with court orders, while invalid non-judicial directives may be disregarded, is not the product of self-protection or arrogance of Judges. Rather it is born of an experience-proved recognition that this rule is essential for the system to work. Judges, after all, are charged with the final responsibility to adjudicate legal disputes. It is the judiciary which is vested with the duty and the power to interpret and apply statutory and constitutional law. Determinations take the form of orders. The problem is unique to the judiciary because of its particular role. Disobedience to a legislative pronouncement in no way interferes with the legislature's ability to discharge its responsibilities (passing laws). The dispute is simply pursued in the judiciary and the legislature is ordinarily free to continue its function unencumbered by any burdens resulting from the disregard of its directives. Similarly, law enforcement is not prevented by failure to convict those who disregard the unconstitutional commands of a policeman.

 On the other hand, the deliberate refusal to obey an order of the court without testing its validity through established processes requires further action by the judiciary, and therefore directly affects the judiciary's ability to discharge its duties and responsibilities. Therefore, "while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration whose judgments and decrees would be only advisory." Gompers v. Buck's Stove & Range Co., *supra*, 221 U.S. at 450, 31 S.Ct. at 501, 55 L.Ed. at 809. See also Yates v. United States, 1958, 356 U.S. 363, 78 S.Ct. 766, 2 L.Ed.2d 837; United States v. Fidanian, 5 Cir., 1972, 465 F.2d 755.

## No Distinction Between Press and Speech

██ Appellants do not challenge the *Walker* case or its predecessors. Rather they argue that these cases simply do not apply to injunctions or other judicial orders infringing freedom of the press. No rationale has been offered to justify different treatment where free press instead of free speech issues are at stake, and we perceive no basis for such a distinction. On the contrary, particular language in the recent Supreme Court decision of New York Times Co. v. United States, 1971, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 suggests that that Court would not sanction disobedience of a court order, even where the injunction unconstitutionally restrains publication of news. In the *Times* case, the lower courts had issued temporary restraining orders prohibiting further publication of the Pentagon Papers pending judicial determination of the merits of the Government's objections. Six of the Justices agreed that these injunctions were violative of the First Amendment. Nevertheless, no one suggested that the injunctions could have been ignored with impunity. On the contrary, Mr. Justice Black, with whom Mr. Justice Douglas concurred, vehemently asserted that "every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment." 403 U.S. at 715, 91 S.Ct. at 2142. Obviously, if the *Times* were free to disregard the unreversed injunctions because of their incompatibility with the First Amendment, the mere presence of impotent and unenforceable restraining orders could not be deemed an ominous immediate denial of First Amendment rights. Mr. Justice Brennan announced an equivalent position. Accordingly, an assumption that courts may punish as contempt violations of even its constitutionally defective orders infringing freedom of the press underlies the *Times* decision.

## A Few Inapplicable Qualifications

Of course, the rule that unconstitutional court orders must nevertheless be obeyed until set aside presupposes the existence of at least three conditions: (i) the court issuing the injunction must enjoy subject matter and personal jurisdiction over the controversy; [16] (ii) adequate and effective remedies must be available for orderly review of the challenged ruling, and (iii) the order must not require an irretrievable surrender of constitutional guarantees. Regarding (i), there is no problem in this case at all.

Regarding (ii), the Supreme Court made quite clear in *Walker, supra,* that its decision was influenced by the fact that there was a two-day interim between the issuance of the injunction and the planned Good Friday march, during which time some effort to secure judicial relief could and should have been made. However, Mr. Justice Stewart emphasized that "this case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims." 388 U.S. at 318, 87 S.Ct. at 1831, 18 L.Ed.2d 1210. If there had been no real opportunity to contest the unconstitutional order, as, for example, if it had been issued at the very moment the march was scheduled to commence, then the premise that effective judicial remedies were available would be undermined and the result would likely have been different.

## The "News Is Today's News" Argument—Newsmen Are Citizens, Too

██ Where the thing enjoined is publication and the communication is

---

16. See, e. g., In re Green, 1962, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198; United States v. Cox, 5 Cir. (en banc) 1965, 342 F.2d 167, *cert. denied sub nom.* Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700. (*Cox* was not a criminal contempt case.)

"news", this condition presents some thorny problems. Timeliness of publication is the hallmark of "news" and the difference between "news" and "history" is merely a matter of hours. Thus, where the publishing of news is sought to be restrained, the incontestable inviolability of the order may depend on the immediate accessibility of orderly review. But in the absence of strong indications that the appellate process was being deliberately stalled—certainly not so in this record—violation with impunity does not occur simply because immediate decision is not forthcoming, even though the communication enjoined is "news". Of course the nature of the expression sought to be exercised is a factor to be considered in determining whether First Amendment rights can be effectively protected by orderly review so as to render disobedience to otherwise unconstitutional mandates nevertheless contemptuous. But newsmen are citizens, too. See Branzburg v. Hayes, *supra*, note 14. They too may sometimes have to wait. They are not yet wrapped in an immunity or given the absolute right to decide with impunity whether a Judge's order is to be obeyed or whether an appellate court is acting promptly enough.

■■■ Regarding (iii) it is obvious that if the order requires an *irrevocable* and permanent surrender of a constitutional right, it cannot be enforced by the contempt power. For example, a witness cannot be punished for contempt of court for refusing a court order to testify if the underlying order violates Fifth, Fourth or perhaps First Amendment rights. Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L. Ed. 319; Gelbard v. United States, 1972, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179. In each of these cases the unconstitutionality of the court's order served as a valid defense to a charge of contempt. The rationale of these cases is that once the witness has complied with an order to testify he cannot thereafter retrieve the information involuntarily revealed, even if it subsequently develops that compelling the testimony violated constitutional rights. In such a predicament, the damage is irreparable.[17] No remedies are available which can effectively cure the constitutional deprivation after the order has been unwillingly obeyed.

■■■ But none of these exculpating factors was present in the case before us. As a matter of jurisdiction (i), the District Court certainly has power to formulate Free Press-Fair Trial orders in cases pending before the court and to enforce those orders against all who have actual and admitted knowledge of its prohibitions. Secondly, as the District Court's findings of fact establish, both the District Court and the Court of Appeals were available and could have been contacted that very day,[18] thereby affording speedy and effective but *orderly* review of the injunction in question swiftly enough to protect the right to publish news while it was still "news". Finally, unlike the compelled testimony

---

17. Cf. Southern Railway Co. v. Lanham, 5 Cir., 1969, 403 F.2d 119, petition for rehearing en banc denied, 408 F.2d 348.

18. The court order was issued on November 1. It was violated on November 2. On November 15 the defendants were convicted of contempt of court. Until this time defendants had made no effort whatsoever to have the injunction set aside. They had not sought reconsideration by the District Court, appeal, mandamus or any other judicial review of the order. *Thereafter*, on December 1 the defendants filed an application for writ of mandamus in this Court seeking to have this Court order the District Court to vacate the injunction. The response filed by the District Court explained that the order had been dissolved and that the mandamus action was therefore moot. On December 7 a panel of this Court (Judges Wisdom, Coleman and Simpson) denied the petition for writ of mandamus "without prejudice to petitioners' appeal from the criminal contempt convictions." Dickinson and Adams v. West, 5 Cir., No. 71-3400, December 7, 1971 (unpublished order).

situations the District Court's order required that information be withheld—not forcibly surrendered—and accordingly, compliance with the Court's order would not require an irrevocable, irretrievable or irreparable abandonment of constitutional privileges.

 Under the circumstances, reporters took a chance. As civil disobedients have done before they ran a risk, the risk being magnified in this case by the law's policy which forecloses their right to assert invalidity of the order as a complete defense to a charge of criminal contempt. Having disobeyed the Court's decree, they must, as civil disobeyers, suffer the consequences [19] for having rebelled at what they deem injustice, but in a manner not authorized by law. They may take comfort in the fact that they, as their many forerunners, have thus established an important constitutional principle—which may be all that was really at stake—but they may not now escape the inescapable legal consequence for their flagrant, intentional disregard of the mandates of a Court.

### Retrospective Invalidity Taints Guilty Finding

The fact that the District Court in the circumstances of this case could validly have punished the defendants for contempt of court despite the unconstitutionality of the underlying order still does not dispose of the case. There remains the question whether the conviction should stand in view of the fact that the District Court's action rested on the good faith but mistaken belief that the order was perfectly valid.

 Contempt, of course, is a *sui generis* proceeding, and "there is no doubt that a contempt proceeding has play in the joints." United States v. Barnett, 5 Cir. (en banc), 1965, 346 F. 2d 99, 107 (Wisdom, J., dissenting). Indeed, contempt may well be the last vestige of the so-called "common law crimes," insofar as a determination that

particular conduct should be punished as contempt depends not so much on specific prohibited acts having occurred as on the Judge's subjective determination that the conduct was culpable, blameworthy and deserving of punishment. It may well be that particular conduct is in direct and flagrant disobedience to a court order but the issuing court whose order is violated may nevertheless decide, for whatever reasons, that no sanctions ought to be imposed. See United States v. Barnett, *supra*.

Given that flexibility in contempt cases, an erroneous view regarding the lawfulness of the underlying order may well taint the judgment of contempt. The case of Donovan v. City of Dallas, 1964, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409, is illustrative. In *Donovan* the Texas Court of Civil Appeals had issued a Writ of Prohibition barring certain Federal Court plaintiffs from prosecuting their claims in the United States Court of Appeals for the Fifth Circuit because the issues had already been litigated in the State Courts. The Federal plaintiffs violated this order and were adjudged to be in contempt. When the case ultimately reached the United States Supreme Court, that Court held that the Texas Writ of Prohibition constituted an unlawful deprivation of a Federal Court litigant's rights to pursue Federal appellant remedies. The invalidity of the Texas order, however, did not in and of itself vitiate the contempt convictions. Rather, the Supreme Court remanded the case for a determination by the Texas Court as to whether or not it still would consider the conduct contemptuous, in view of the subsequent pronouncement that the restraining order was unconstitutional. "Whether the Texas court would have punished petitioners for contempt had it known that the restraining order petitioners violated was invalid, we do not know. However, since that question was neither considered nor decided by the Texas court, we leave it for consideration by that court

19. In this case the consequences came relatively painlessly. The defendants were merely fined $300.00 each.

on remand." 377 U.S. at 414, 84 S.Ct. at 1583.

On remand the Texas Court of Civil Appeals determined that the judgments of contempt were inappropriate in view of the Supreme Court pronouncement that the restraining orders were unlawful. Accordingly, the contempt convictions were vacated.

The Tenth Circuit adopted a comparable approach in Dunn v. United States, 10 Cir., 1968, 388 F.2d 511.[20] Following *Donovan* that Court vacated and remanded a contempt conviction for reconsideration in view of the fact that "the District Court acted on the assumption that its order was valid. We have held to the contrary with the result that Dunn is subjected to punishment for disobedience of an invalid order." 388 F.2d at 513. Undeniably, there is no absolute prohibition to such a result ensuing but where the premise (*lawful* order disobeyed) is erroneous, the conclusion (conduct contemptuous) is tainted.

In the case before us the conclusion of contempt was bottomed irrevocably on a mistake of law—"It was the opinion of this Court then and it is its opinion now that the order issued was authorized by [paragraph 9 of the Court's Free Press-Fair Trial] Rule." It was not. Since the determination that the conduct of the respondents was contemptuous was premised on this erroneous view, it is appropriate to remand the case to the District Court for a determination of whether the judgment of contempt or the punishment therefor would still be deemed appropriate in light of the fact that the order disobeyed was constitutionally infirm.

Vacated and remanded.

---

**20.** That tortuous case had its start in this Circuit, and it is not over yet. See Koehring Co. v. Hyde Construction Co., 5 Cir., 1963, 324 F.2d 295; Dunn v. Stewart, S.D.Miss., 1964, 235 F.Supp. 955, rev'd sub nom. Stewart v. Dunn, 5 Cir., 1966, 363 F.2d 591; Koehring Co. v. Hyde Construction Co., 254 Miss. 214, 178 So.2d 838, 182 So.2d 580, 184 So. 2d 415; Koehring Co. v. Hyde Construction Co., 253 Miss. 675, 178 So.2d 857; Hyde Construction Co. v. Koehring Co., 10 Cir., 1965, 348 F.2d 643, cert. denied, 1966, 385 U.S. 949, 87 S.Ct. 323, 17 L. Ed.2d 227; Koehring Co. v. Hyde Construction Co., 1966, 382 U.S. 362, 86 S. Ct. 522, 15 L.Ed.2d 416, reh. den. 383 U.S. 939, 86 S.Ct. 1062, 15 L.Ed.2d 857; Hyde Construction Co. v. Koehring Co., 10 Cir., 1968, 388 F.2d 501, cert. denied, 391 U.S. 905, 88 S.Ct. 1654, 20 L.Ed.2d 419; Dunn v. United States, 10 Cir., 1968, 388 F.2d 511; Hyde Construction Co. v. Koehring Co., S.D.Miss., 1969, 321 F.Supp. 1193; Koehring Co. v. Hyde Construction Co., 7 Cir., 1970, 424 F.2d 1200; Hyde Construction Co. v. Koehring Co., 5 Cir., 1972, 455 F.2d 337.