447 So.2d 892 (1983)
John H. JAMASON and James Gabbard, Appellants,
v.
STATE of Florida, Appellee.
No. 82-565.
District Court of Appeal of Florida, Fourth District.
March 23, 1983.
David Roth of Cone, Wagner, Nugent, Johnson, Hazouri & Roth, and Larry Klein, West Palm Beach, for appellants.
Jim Smith, Atty. Gen., Tallahassee, and Mark C. Menser, Asst. Atty. Gen., Daytona Beach, for appellee.
Leon St. John, Florida Criminal Defense Attys' Ass'n, West Palm Beach, as amicus curiae.
HERSEY, Judge.
Appellants, law enforcement officers, were adjudged guilty of criminal contempt and were each fined $500.00. The contempt *893 consisted of refusal to comply with the telephonic order of a circuit court judge to produce and bring before her an individual in the custody of appellants. Custody terminated before a formal writ of habeas corpus could be served. After notice and a hearing the judge entered the order under review here.
These skeletal facts need fleshing out in order to place the important issues in proper perspective. In brief: On January 18, 1982, at approximately 9:30 a.m., Judge Rosemary Barkett received a telephone call from Steven Gomberg, an attorney in private practice. Attorney Gomberg explained to Judge Barkett that he had been retained by the wife of one John Melody, who was being detained at the West Palm Beach Police Department. Attorney Gomberg stated that appellant Gabbard (a lieutenant with the West Palm Beach Police Department) had refused his request to see John Melody.
Mr. Melody was, in fact, in custody as a suspect in a rape case. He had been advised of his constitutional rights and had made no request to consult with counsel or to contact anyone.
On the basis of the call from attorney Gomberg, Judge Barkett telephoned appellant Gabbard and stated that she was "issuing an oral writ of habeas corpus to bring John Wayne Melody before me immediately." Appellant Gabbard declined to comply and the judge asked to speak to appellant Jamason (Chief of the West Palm Beach Police Department) who also refused to comply with the oral order. Appellants did not doubt that the person issuing the oral order was Judge Barkett.
At about 12:15 p.m. a formal writ of habeas corpus was served on Major Mann of the West Palm Beach Police Department; however, Melody was no longer in the custody of that Department. He had been transferred to the Palm Beach County Jail for booking. Appellants allege that if Melody had been in their custody at the time the written writ was served, they would have complied with it.
In fact, appellants (through Major Mann of the Police Department) informed personnel at the county jail of the issuance of the writ and sent a copy of it to the jail. At some point in time after the oral order was issued, a written petition for a writ of habeas corpus was filed.
The question to be answered by these appellate proceedings is whether the willful refusal to obey a telephonic order (in the nature of a writ of habeas corpus) issued by a court of general jurisdiction and based upon an oral application therefor by an attorney for the individual said to be illegally restrained, may constitute criminal contempt.
The first important issue to be determined is whether, and if so under what circumstances, an oral order of a court of general jurisdiction may be disregarded with impunity. The clear answer is that only if an order is entered in a matter concerning which the court has no jurisdiction may such an order be safely ignored. The corollary of that rule is that whether an order be totally erroneous or irregular or even unconstitutional, its violation may constitute a criminal contempt. We explained this rule at length in Sandstrom v. State, 309 So.2d 17, 20 (Fla. 4th DCA 1975), quoting Anno: Contempt  Disobeying Invalid Decree, 12 A.L.R.2d 1059, 1107.
Where the court has jurisdiction over the subject matter and the parties and has the authority or power to render the particular order or decree, the fact that such order or decree, violation or disobedience of which is made the basis of the contempt charge, is erroneous or irregular or improvidently rendered, does not justify the defendant in failing to abide by its terms, and his conduct in failing to do so may be punished as for contempt despite the error or irregularity. It is almost unanimously agreed that if the defendant desires to attack the order or decree as erroneous, he must do so, not by disregarding or violating it and then setting the error up as a defense to a charge of contempt, but by attacking the order on direct appeal or by motion to set *894 it aside. He cannot attack it collaterally upon an appeal from the judgment of contempt or upon an application for habeas corpus to be released from imprisonment for contempt. He must obey the order so long as it is in effect and until it is dissolved by the court issuing it, or reversed on appeal by the appellate court.
The rule is not the progeny of the arrogance of the judiciary but a safeguard of the rights of citizens to have their lives, their property and their freedom protected from attack from any source by an independent and impartial court guided by a system of enshrined laws. Its rationale was more fully explored by the Fifth Circuit Court of Appeals in United States v. Dickinson, 465 F.2d 496, 510 (5th Cir.1972):
The criminal contempt exception requiring compliance with court orders, while invalid nonjudicial directives may be disregarded, is not the product of self-protection or arrogance of Judges. Rather it is born of an experience proved recognition that this rule is essential for the system to work. Judges, after all, are charged with the final responsibility to adjudicate legal disputes. It is the judiciary which is vested with the duty and the power to interpret and apply statutory and constitutional law. Determinations take the form of orders. The problem is unique to the judiciary because of its particular role ... . the deliberate refusal to obey an order of the court without testing its validity through established processes requires further action by the judiciary, and therefore directly affects the judiciary's ability to discharge its duties and responsibilities. Therefore, `while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration whose judgments and decrees would be only advisory.'
There are two significant jurisdictional events involved in the present case, both of which raise issues which appear to be matters of first impression in this jurisdiction.
The first is whether jurisdiction of the subject matter in a habeas corpus proceeding is properly invoked by an oral application. Chapter 79, Florida Statutes (1981), studied in a vacuum, would dictate a negative reply to this inquiry. We may not stop there, however. The great writ has its origins in antiquity and its parameters have been shaped by suffering and deprivation. It is more than a privilege with which free men are endowed by constitutional mandate; it is a writ of ancient right.
The great writ, known commonly by the name of habeas corpus, was a high prerogative writ known to the common law, the object of which was the liberation of those who were imprisoned without sufficient cause. See Ex-parte Watkins, 3 Pet. (28 U.S.) 193, 7 L.Ed. 650.
It is a writ of inquiry upon matters of which the State itself is concerned in aid of right and liberty. State v. Michel, 105 La. 741, text 747, 30 South.Rep. 122, 54 L.R.A. 927; Ex parte Coupland, 26 Tex. 386.
The name of the writ is "habeas corpus ad subjiciendum et recipiendum." It is not an action or suit but is a summary remedy open to the person detained. It is civil rather than criminal in nature and is a legal and not equitable remedy. See Ex-parte Watkins, supra; Ex-parte Bollman, 4 Cranch (8 U.S.) 75, 2 L.Ed. 554.
... .
[W]hile the writ had been in use in England from remote antiquity it was often assailed by kings who sought tyrannical power and the benefits of the writ were in a great degree eluded by time-serving judges who assumed a discretionary power in awarding or refusing it and were disposed to support royal and ministerial usurpations. Owing to such abuses the writ became powerless to release persons imprisoned without any cause assigned. In the fight by the people against the *895 abuses of the writ, petitions of rights were submitted to the king and during the reign of Charles I, A.D. 1641, provisions were enacted intended to make the writ effectual. These activities were however vain. At last, in 1679, the Statute 31 Chas. II Chap. 2 was enacted. That Act is known as the Habeas Corpus Act. That Act has been substantially incorporated into the jurisprudence of every State in the Union and the right to it secured by their Constitutions. The Constitution of the United States provides that the privilege of the writ of habeas corpus shall not be suspended except in certain circumstances. Art. I, Sec. 9, par. 2, U.S. Const.
The application for the writ may be made by an agent or friend, wife, husband, or the person detained himself, or by parent for his child, guardian for his ward, or special bail for his principal. In any event it must be a friendly person in the interest of the person illegally detained.
State ex rel. Deeb v. Fabisinski, 111 Fla. 454, 460-461, 152 So. 207, rehearing denied 156 So. 261 (1933).
It was early established that no formal application was required to invoke the jurisdiction of the courts in habeas corpus proceedings. "No formal application for habeas corpus is required." Martin v. State, 123 Fla. 143, 145, 166 So. 467 (1936). "The writ of habeas corpus is a writ of right. It is sometimes issued upon very informal application, Ex Parte Pells, 28 Fla. 67, 9 South.Rep. 833." Ex Parte: Ernest Amos, 93 Fla. 5, 11, 112 So. 289 (1927). The most extreme statement of the rule is represented by the following quotation from Corpus Juris Secundum:
[t]he writ may be issued by the court of its own motion in a proper case. 39A C.J.S., Habeas Corpus § 167.a (1976).
This quotation taken out of context is inserted here merely for contrast. We are not called upon to decide whether a judge may sua sponte issue the writ but whether a telephonic application is a viable alternative to some form of written application, as, for an example of the latter, an informal letter written to a Justice of the Supreme Court. Sneed v. Mayo, 66 So.2d 865 (Fla. 1953).
As a general rule, a habeas corpus proceeding is an independent action, legal and civil in nature, designed to secure prompt determination as to the legality of restraint in some form.
Crane v. Hayes, 253 So.2d 435, 439 (Fla. 1971).
Habeas corpus, then, like the unicorn, is a unique animal. Public policy demands that it be readily, speedily and constantly available. The judiciary has been singularly zealous in responding to that policy. Given the history of the great writ in politics as well as in the judicial arena we are inclined to the view that the oral application involved here was sufficient to invoke the court's jurisdiction. As was said in Anglin v. Mayo, 88 So.2d 918, 919-920 (Fla. 1956):
[H]istorically, habeas corpus is a high prerogative writ. It is as old as the common law itself and is an integral part of our own democratic process. The procedure for the granting of this particular writ is not to be circumscribed by hard and fast rules or technicalities which often accompany our consideration of other processes. If it appears to a court of competent jurisdiction that a man is being illegally restrained of his liberty, it is the responsibility of the court to brush aside formal technicalities and issue such appropriate orders as will do justice. In habeas corpus the niceties of the procedure are not anywhere near as important as the determination of the ultimate question as to the legality of the restraint.
We do no more than expand upon the phrase "If it appears to a court of competent jurisdiction" when we determine that if the court is advised by an oral communication by one having a legitimate interest that an individual may be "illegally restrained of his liberty, it is the responsibility of the court to ... issue such appropriate orders as will do justice."
We are aware of no policy considerations which would lead to a different result. If *896 we bear in mind that all we are concerned with at this juncture is activating the jurisdiction of the court, any parade of horribles picturing an unbridled judiciary seeking omnipotence must be brushed aside. The court has no more power, nor any less, in an action commenced by the spoken as opposed to the written word. The criteria is availability or access to the courts and no other rule suits it so well.
Such a rule, on the other hand, should give the judiciary food for thought. Problems of identity, credibility, reality of interest and even judicial immunity from personal liability may become issues in or consequent upon habeas corpus proceedings instituted orally. Such questions will demand the exercise of judicial discretion to a high degree.
Having therefore concluded that the court had subject matter jurisdiction so that the order was not void on that account, we next consider the second jurisdictional event: the oral order. Both parties concede the validity of unwritten orders under a multitude of circumstances. We doubt that the present case fits within any of such circumstances. We lean toward the view, without deciding, that service of a formal writ is an absolute requirement to obtain personal jurisdiction over the authority it is claimed illegally restrains the body of the captive individual. We need not decide the issue, however, as it involves jurisdiction over the person, which, if defective, renders the order voidable only, not void. One may not disobey with impunity the order of a court which is merely voidable, as here.
We have come full circle. The court, having subject matter jurisdiction, issued an order (which may be voidable because it was oral) in the nature of a writ of habeas corpus with which appellants chose to refuse to comply. We are somewhat sympathetic to appellants' argument that they were seeking, through what appeared to them to be the only channel open for that purpose, appellate resolution of an issue which appears to have been a frequently encountered and therefore troublesome one, to wit: oral orders. Technically, however, they committed an act of criminal contempt in the process and we are not prepared to determine that the amounts of the respective fines represent an abuse of discretion.
In affirming on the foregoing basis we specifically do not foreclose the possibility that the amount of the fines may be reduced either by the trial court, sua sponte, or upon appropriate application to the trial court by appellants for post-conviction relief.
Further, because the matter is one of first impression in the State of Florida and may in one of its potentially infinite variations recur with some frequency, we determine the issue to be one of great public importance and certify the following question to the supreme court:
Whether the willful refusal to obey a telephonic order (in the nature of a writ of habeas corpus) issued by a court of general jurisdiction and based upon an oral application therefor by an attorney for the individual said to be illegally restrained, may constitute criminal contempt.
AFFIRMED; REMANDED; QUESTION CERTIFIED.
ANSTEAD and WALDEN, JJ., concur.